**SECURITIES & EXCHANGE COMMISSION v. COGAN.**

**COGAN v. SECURITIES & EXCHANGE COMMISSION et al.**

**JONES v. SECURITIES & EXCHANGE COMMISSION et al.**

Nos. 12716–12813.

United States Court of Appeals, Ninth Circuit.

Dec. 15, 1951.

On Rehearing Dec. 22, 1952.

Roger S. Foster, Gen. Counsel, Myron S. Isaacs, Chief Counsel, Division of Public Utilities, W. Victor Rodin, Atty., Securities & Exchange Commission, Washington, D. C., for appellant Securities & Exchange Commission.

William J. Cogan, New York City, M. Mitchell Bourquin, San Francisco, Cal., for appellants Cogan and Jones.

Seibert & Riggs, Emil Morosini, Jr., William A. Todd, New York City, for appellee Standard Power & Light Corp.

A. Louis Flynn, Helmer Hansen, Chicago, Ill., for appellee Standard Gas & Electric Co.

Douglass Newman, New York City, for appellee Market St. R. Co.

Before DENMAN, Chief Judge, and BONE and POPE, Circuit Judges.

DENMAN, Chief Judge.

These appeals, consolidated for hearing, are from two orders of the district court rendered on July 11, 1950, and November 21, 1950, pursuant to Section 11(e) of the Public Utility Holding Company Act of 1935.[1] The order of July 11th approved the principal provisions of a Securities & Exchange Commission order for the reorganization of Market Street Railway Co., but disapproved the plan insofar as it failed to provide an allowance of fees for William J. Cogan as attorney for the Van Kirk Committee for prior preference stockholders of Market Street, and remanded the proceeding to the Commission. The Commission appeals here from the portions of the order of July 11, 1950, which disapproved disallowance of the attorney's fee. The remainder of the order which approved the reorganization plan in all other respects was appealed from by Cogan personally but not as attorney for any person affected by the plan—and hence is not considered by us.

Upon remand to the Commission, the plan was ordered divided into two steps. Step One ordered a reorganization in substance as in the reorganization plan approved by the district court's order of July 11, 1950, other than as to the above fees. For this portion of the plan the Commission sought approval of the district court which was granted by the court's order of November 21st. From this order, Jones, a prior preferred shareholder of Market Street, appeals. Step Two ordered reserved the question of the fees awaiting our decision on the district court order disapproving disallowance of Cogan's fees.

Three issues confront us on this appeal: (a) whether Step One of the Commission's last order providing for reorganization of Market Street and settlement of all claims made by or against Market Street is fair and equitable within the meaning of Section 11(a) of the Holding Company Act of 1935;[2] (b) whether the Commission acted within its powers in denying Cogan's fee; and (c) whether the court below gave an adequate judicial review to the Commission's order.

■ (a) Appellant Jones attacks the fairness and equity of the reorganization plan principally because an alleged claim which Market Street had against another corporation was included in a general release of claims which was part of the reorganization plan. The background is this: Market Street is a subsidiary company of Standard Gas and Electric Company (Standard Gas) and of Standard Power and Light Corporation (Standard Power). It carried on its books an open account debt to Standard Gas in the amount of $1,026,-249. The validity of this debt was challenged by certain of Market Street's shareholders.

On May 20, 1947, the Commission, acting upon a petition filed with it on behalf of the Van Kirk Committee by its attorney, William J. Cogan, ordered that a public hearing be held to inquire into the relationships, past and present, between Market Street and its associate companies, the character of the interests of Standard Gas in Market Street, and the facts concerning charges entered on the open account for services done for Market Street by affiliated companies. The Van Kirk Committee contended that these service charges were fraudulently imposed on Market Street by its affiliated companies since no substantial services were rendered to Market Street.

During the period of the hearing, negotiations were had for a settlement of the open account claim of Standard Gas. Early in December, 1947, Cogan and Standard Gas agreed to a settlement of the claim, pursuant to which Market Street would, among other things, pay $550,000 to Stand-

1. 15 U.S.C.A. § 79, et seq.

2. 15 U.S.C.A. § 79k(a).

ard Gas and Market Street and Standard Gas would each pay $25,000 to Cogan and $12,500 to the Van Kirk Committee.

On May 3, 1948, Market Street filed with the Commission an application for approval of a proposed reorganization plan substantially embodying the terms of the settlement. The principal modifications of the plan required by the Commission were the elimination of the proposed payments to attorney Cogan and a reduction of the amount payable by Market Street to Standard Gas from $550,000 to $512,500, the net amount which Standard Gas would have received under the plan after proposed payments by Standard to Cogan and to the Van Kirk Committee. The Commission now says that payment of the amount was approved as fair and equitable to Market Street and its prior preference stockholders and to Standard Gas, upon consideration of apparent overcharges against Market Street during the period of 1926–1935 for services rendered by affiliates of Standard Gas. This was indicated in part by payments to Standard Power aggregating $270,000 by one of such affiliates, out of fees billed to Market Street. The Commission also considered the facts that some valuable services were rendered to Market Street and that Standard Gas had made substantial cash advances to Market Street for the servicing of Market Street's bonds then outstanding.

On October 14, 1949, two weeks after the Commission denied his fee, Cogan filed an action against Standard Power in the name of the Van Kirk Committee and appellant Jones, seeking to recover for Market Street the above sum of $270,000. Standard Power is at present a parent of Standard Gas, but during the years 1926 through 1929, when the $270,000 was paid to Standard Power, it was a subsidiary of Standard Gas.

On March 9, 1950, the Commission found that the reorganization plan should be further amended to provide clearly for a complete release of Standard Gas and its subsidiaries, including Standard Power. Jones now claims that the settlement was not intended to include the claim for $270,000 against Standard Power. This contention cannot be sustained. The overcharges pre-sumably made against Market Street were all made by the same management company, Byllesby Engineering & Management Corp., a part of the Standard Gas system. From 1926–29, $270,000 of these charges were paid over to Standard Power by Byllesby.

Cogan seeks to dissect this particular $270,000 transfer from the remainder of the pattern of overcharging. The only fact that lends color to his argument is that when Standard Power received the money from Byllesby it was the immediate parent of Market Street; but after a shift of corporate shares in 1930, Standard Gas became the immediate parent and Standard Power the grandparent holding company of Market Street. It was after this shift of position that the open account became most active. However, the pattern of overcharge continued as before and pursuant to substantially the same management contract as before. The evidence is overwhelming that the history of overcharge was regarded throughout the settlement negotiation as a unitary thing, despite a shift in corporate relations in 1930. During the investigation by the Securities & Exchange Commission the evidence which Cogan himself submitted referred indiscriminately to the entire period between 1926–35. It is obvious that a complete satisfaction of all claims relating to overcharges was accomplished in the settlement agreement and adopted as part of the final plan of reorganization.

(b) Appellee Cogan, who challenges the disallowance by the Commission of his fee, is conceded by all to have been instrumental in uncovering wrongful overcharges against Market Street by its parent companies. However, in the course of his activities and after two abortive attempts in 1947 to reach a settlement of the claims between Market Street and Standard Gas, Cogan met certain officers of Standard Gas and in a discussion with them said to his adversaries in the negotiation that, "In case you don't want me as counsel against you on any other matter, perhaps you could give me a retainer." At one point Cogan explained that this statement was made in jest. At another time he explained that the statement had a more serious motive, that

the reference to "other matter" was to possible claims by other subsidiaries of Standard Gas for wrongful overcharges on management contracts. Cogan's offer was not accepted and a vice-president of Standard Gas testified that he did not understand this offer to relate to the settlement negotiations then going on. But the Commission chose to infer from these facts that Cogan had lost his independence in representing his shareholder clients. At the time of this meeting the parties were still $300,000 apart in their negotiations, but Cogan had specified that upon settlement his fee was to be $50,000. Subsequently Cogan increased his offer to Standard Gas by $200,-000 and Standard Gas reduced its claim by $100,000 in order to reach the settlement figure. The fee figure was not changed. The Commission declined to speculate upon the precise effect of Cogan's offer to accept a retainer from his adversary.

Upon this theory for the Commission's action, the result must be sustained. We have here a rule which has been applied with great severity by courts seeking to control the conduct of attorneys who are officers of the court.[3] When an attorney has been found subject to a conflict of interest in his representation, the tribunal before which he appears has discretion to deny him any fee.[4] Indeed the Act governing this reorganization proceeding provides that "any or all fees, expenses, and remuneration, to whomsoever paid, in connection with any reorganization * * * of a registered holding company or subsidiary company thereof * * * shall be subject to approval by the Commission."[5]

The district court can set aside the Commission's action only if it amounts to an abuse of discretion. Upon an examination of all the record evidence plus exhibits which have been appended to Cogan's brief, we cannot say that the Commission's action is an abuse of discretion. The Commission's inference that there was a conflict of interest was a reasonable one, and since the widom of the order is not our concern, we cannot substitute a different inference which we might draw.[6]

■ (c) Appellant Jones claims that the district court which reviewed the reorganization plan gave it an inadequate judicial review and that § 10(e) of the Administrative Procedure Act was thereby violated. There is no merit to this contention. Section 10(e)[7] of the Act, which applies to the Commission, requires the district court to set aside agency findings which are "unsupported by substantial evidence * * *. In making the foregoing determinations the court shall review the whole record *or such portions thereof as may be cited by any party*". (Emphasis supplied.)

The order concerning the reorganization plan was made after a hearing of two full days, taking up 260 pages of the record. In the course of that hearing the attorneys for all the parties concerned cited the portions of the record, including the transcript of testimony upon which they relied. At the conclusion of the hearing with its cited portions of the transcript the court stated it had reached certain conclusions and said: "I have heard all the arguments in the matter. Of course, I haven't examined the record, that is, at least that portion of the record which consists of the transcript, and needless to say, I haven't examined any of the matters that are contained in the trunk, documents and what not. * * * If any counsel feel they want to submit anything further in connection with the matter that would make any material difference, I wouldn't want to shut any of you off."

Cogan did not submit any further citations from the record and made no request that the transcript be read, nor did he take any exception to the court's not considering it. Nor did he make it a part of his specifications of error filed in the district court.

3. In re Midland United Co., 3 Cir., 159 F.2d 340; Tracy v. Willys Corp., 6 Cir., 45 F.2d 485.

4. Woods v. City Nat'l Bank & Trust Co., 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820.

5. 15 U.S.C. § 79k(f). See In re Electric Bond & Share Co., D.C.N.Y., 80 F.Supp. 795.

6. S. E. C. v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995.

7. 5 U.S.C.A. § 1009(e).

We regard his attempt to raise this issue in his brief on appeal as a frivolous afterthought.

The district court order of November 21, 1950, approving Step One of the final plan of reorganization is affirmed. That portion of the July 11, 1950 order relating to Cogan's fee is reversed.

## On Rehearing.

POPE, Circuit Judge.

After application for a rehearing which followed our former opinion in this matter, we granted a rehearing limited to the question of the propriety of the Commission's action in denying Cogan's fee. Now, after hearing the arguments upon the rehearing, we are convinced that so much of our former opinion as directed a reversal of that portion of the district court's order relating to Cogan's fee was wrong, and that the orders of the district court should be affirmed in their entirety.

The facts are adequately stated in our former opinion and need not be repeated here. Briefly, the Commission disallowed the fee proposed for appellee Cogan because (1), in a discussion with the officers of Standard Gas, with whom Cogan was dealing in an attempt to reach a settlement of claims between Market Street and Standard Gas, Cogan said "In case you don't want me as counsel against you on any other matter, perhaps you could give me a retainer", and (2), because during the negotiations for settlement, Cogan indicated that he was willing to agree to a payment of a stated sum to Standard Gas provided he was paid a counsel fee of $50,000 and the committee which he represented was paid a fee of $25,000. Of these circumstances the Commission said: "We find it unnecessary to speculate whether Cogan was then motivated only by the desire to secure a settlement which would be consonant with and sustain his fees or whether a more favorable settlement could have been achieved, since we think it clear that he had so compromised his bargaining position that the Prior Preference Stockholders were no longer receiving the representation to which they were entitled. Thereafter, a determination by Cogan of the degree of pressure to be put on Standard was subject to consideration of what had become his personal stake."

We think it should be noted that the suggestion with respect to the retainer was never acted upon. If Cogan's remark was an offer it was never accepted, and if it could be said that Cogan was suggesting that something be done which would bring about a conflict of interest, that suggestion was never consummated. The record is barren of any evidence that this remark of Cogan had any bearing whatever upon the negotiations then or thereafter.

It is difficult to observe much impropriety in an attorney's inquiry into the subject of a fee. Apart from any improper conduct on the part of an attorney, an allowance of an attorney's fee to a person in Cogan's position would be in order. What that fee would amount to would be a matter of interest not only to the attorney but to his client and to the person on the other side of the negotiations. The amount of fee must ultimately come out of the total sum available for settlement between the parties. In any normal case its amount must either increase what the paying party gives or decrease what the receiving party gets, or its burden must be divided between the two.[1]

---

1. As a matter of substance such is true here notwithstanding the agreement took the form of providing that half of Cogan's fee would be paid by Market Street and half by Standard Gas. Standard was interested only in its net realization, and if it must pay $25,000 of its receipts to Cogan, it must demand that much more from Market Street. In reality it adds up to a situation in which a fund, limited by what Market Street is willing to pay, must somehow cover the fees in question. It was a mere matter of mechanics whether Cogan be paid by Market Street directly, or indirectly by an increased payment to Standard. The Commission plainly had this view of the matter. The original plan called for $25,000 of Cogan's fee, and $12,500 of Van Kirk's fee, to be paid by Standard Gas, a total of $37,500. When the amended plan was set up, whereby Cogan was to receive nothing and Van Kirk was to be paid $7,500 by Market Street alone, the total

The tribunal called upon to evaluate the facts in respect to this inquiry could, we think, with propriety find that Cogan's discussion of the fee to be paid him was no more than a perfectly proper exploration into a subject which, as we have indicated, would be of substantial interest to both parties to the negotiations.

The matter is before us upon appeal from orders of the district court. The district court's action was invoked under the provisions of § 11(e) of the Public Utility Holding Company Act, Title 15 U.S.C.A. § 79k(e). Under that section the court is charged with approving or disapproving the plan presented to it. Its approval is dependent upon the court's finding the plan "fair and equitable and as appropriate to effectuate the provisions of this section". In so doing the court was charged with making a judicial review of the action of the Commission, and the scope of that review is precisely the same as if a party aggrieved had sought review under the provisions of § 24(a) of the Act. S. E. C. v. Central-Illinois Corp., 338 U.S. 96, 125, 69 S.Ct. 1377, 93 L.Ed. 1836.[2]

■ In holding that Cogan's fee would not be allowed, the Commission was laying down a rule of law and making a determination of legal issues. Its decisions in that regard are subject to judicial review and determination. S. E. C. v. Central-Illinois Corp., supra.

The Commission contends that its determination and conclusion is not subject to such review for the reason that without regard to how its decision squares with the decisions of the courts upon the question of when a breach of fiduciary duty is sufficient to forfeit an attorney's fee, it was here invoking a higher standard of fiduciary conduct than that sometimes applied by the courts. It says that on the basis of its experience in administering the Act, it was here undertaking to create new standards of fiduciary conduct in order to effectuate the policy of the Act, and which it was equipped to do because of its special competence in this field, and invokes the doctrine of the second Chenery case, Securities Comm. v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995.

But in S. E. C. v. Central-Illinois Corp., supra, which was a proceeding under the identical § 11(e) under which the present proceeding was brought, the court while recognizing the doctrine of the second Chenery case and the proposition that a court would not substitute its judgment for "[a]dministrative determinations of policy, often based upon undisputed basic facts, in an area in which Congress has given the agency authority to develop rules based upon its expert knowledge and experience", [338 U.S. 96, 69 S.Ct. 1393] nevertheless held that where in a proceeding under this section some of the matters presented raised legal issues, it will examine those issues and arrive at and enforce its own conclusion.[3] In this respect the court was but following its own decision in the simi-

---

amount required to be paid Standard Gas was reduced by the same $37,500 to a total of $512,500.

2. In that case 338 U.S. at page 116, 69 S.Ct. at page 1388, 93 L.Ed. 1836, the court summarized the provisions of § 24 (a), 15 U.S.C.A. § 79x, as follows: "'Any person or party aggrieved by an order issued by the Commission * * * may obtain a review of such order in the circuit court of appeals * * * by filing in such court, within sixty days * * * a written petition * * *. [T]he Commission shall certify and file in the court a transcript of the record upon which the order complained of was entered * * *. [S]uch court shall have exclusive jurisdiction to affirm, modify, or set aside such order, in whole or in part.

No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission or unless there were reasonable grounds for failure so to do. The findings of the Commission as to the facts, if supported by substantial evidence, shall be conclusive.'"

3. In speaking of the scope of § 11(e) the court said, 338 U.S. at page 125, 69 S.Ct. at page 1393, 93 L.Ed. 1836: "We do not think it was intended to define with accuracy the scope of review to be exercised over matters committed to the Commission's discretion and expert judgment, *not involving questions of law*, or to set up a different and conflicting standard in those matters from the one to be applied in proceedings under § 24(a)." (Empha-

lar case of Otis & Co. v. S. E. C., 323 U.S. 624, 65 S.Ct. 483, 89 L.Ed. 511.

We bear in mind of course that in this context the distinction between what are "questions of fact" and what are "questions of law," to which the courts give so much lip service, is not one which may be made by drawing a line between questions which are analytically law or fact or in accordance with the traditional distinctions between what is for the jury and what is for the court. As stated in S. E. C. v. Central-Illinois Corp., supra, 338 U.S. at page 126, 69 S.Ct. at page 1393, 93 L.Ed. 1836: "Administrative finality is not, of course, applicable only to agency findings of 'fact' in the narrow, literal sense." As Professor Dickinson has said: "In truth, the distinction between 'questions of law' and 'questions of fact' really gives little help in determining how far the courts will review; and for the good reason that there is no fixed distinction. They are not two mutually exclusive *kinds* of questions based upon a difference of subject matter * * *. The knife of policy alone effects an artificial cleavage at the point where the court chooses to draw the line between public interest and private right." [4]

We think that the best clue as to where the line should be drawn between those matters in which the court's judgment may properly be substituted for that of the administrative agency, and the sound rule as to the distinction between what, for want of better description, we here refer to as "questions of fact" and "questions of law," is to be found in Dobson v. Commissioner, 320 U.S. 489, 498, 64 S.Ct. 239, 246, 88 L. Ed. 248.[5] Speaking of the question as to how far the court should go in reviewing the decisions of the Tax Court, the court said, 320 U.S. at pages 498, 499, 64 S.Ct. at page 245: "The [tax] court is independent, and its neutrality is not clouded by prosecuting duties. Its procedures assure fair hearings. Its deliberations are evidenced by careful opinions. All guides to judgment available to judges are habitually consulted and respected. It has established a tradition of freedom from bias and pressures. It deals with a subject that is highly specialized and so complex as to be the despair of judges. It is relatively better staffed for its task than is the judiciary. Its members not infrequently bring to their task long legislative or administrative experience in their subject. The volume of tax matters flowing through the Tax Court keeps its members abreast of changing statutes, regulations, and Bureau practices, informed as to the background of controversies and aware of the impact of their decisions on both Treasury and taxpayer. Individual cases are disposed of wholly on records publicly made, in adversary proceedings, and the court has no responsibility for previous handling. Tested by every theoretical and practical reason for administrative finality, no administrative decisions are entitled to higher credit in the

sis supplied.) After examining the questions presented by the simplification proceedings, and the plan presented in that case, the court said, 338 U.S. at page 129, 69 S.Ct. at page 1394: "We think at least some of these matters do raise legal issues, particularly in the light of the Otis decision, which should now be considered and resolved." The court thereupon proceeded to exercise and apply its own judgment as to the legal issues there discussed. The outstanding difference between the Central-Illinois case and the second Chenery case is to be found in the fact that the court thus announced and established its own views. Had it followed the rule of the second Chenery case presumably it would have contented itself with saying, as it did there, 332 U.S. at page 207, 67 S.Ct. at page 1582,

91 L.Ed. 1995: "The scope of our review of an administrative order wherein a new principle is announced and applied is no different from that which pertains to ordinary administrative action. *The wisdom of the principle adopted is none of our concern.*" (Emphasis supplied.)

4. Dickinson, Administrative Justice and the Supremacy of the Law, (1927) 55, as quoted in "Final Report of the Attorney General's Committee on Administrative Procedure", p. 88.

5. While the specific rule of that case has been superseded by statute, 62 Stat. 991, 1948, 26 U.S.C.A. § 1141(a), the opinion by Mr. Justice Jackson was that of a unanimous court, and there is no reason to doubt that what the opinion said of the distinction here discussed is still the view of the court.

courts." The court then went on to discuss the difficulty inherent in the "want of a certain standard for distinguishing 'questions of law' from 'questions of fact' ", and concluded that a determination of the Tax Court as to whether particular transactions were integrated or separated for tax purposes, was "no more reviewable than any other question of fact". The court held that review was being sought for a question "purely an accounting problem and therefore a question of fact".

Judged by all ordinary analytical standards as to what is law and what is fact, the matter there before the court was clearly a question of law. The reason why the court classified the matter as a non-reviewable question of fact is to be found in the court's comments quoted above as to the special competence of the Tax Court—the fact that it is "relatively better staffed for its task than is the judiciary". The distinction drawn in the Dobson case is on the basis of the comparative qualifications of the Tax Court and of the reviewing courts. This same distinction is exemplified in the two Chenery cases, the so-called second Chenery case, supra, and the first Chenery case, Securities Comm. v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 459, 87 L.Ed. 626.

In the first Chenery case, the order of the Commission which was there under review, was based upon the Commission's determination as to what was required by certain "principles of equity derived from judicial decisions". The court found that the cases upon which the Commission relied did not establish the principles of law and equity which the Commission considered sustained its order. The court without hesitation set aside the order of the Commission for clearly the question before the Commission was not one involving a

determination of policy or of a matter upon which the Commission could be said to have superior experience or competence, but rather was upon a question that was peculiarly within judicial competence.

The contrast is furnished by the second Chenery case, supra, in which the Commission, deriving "its conclusions from the particular facts in the case, its general experience in reorganization matters and its informed view of statutory requirements", announced a new principle which on the basis of its experience, it found appropriate in order to effectuate the policy of the Act. The court held that "The wisdom of the principle adopted is none of our concern. * * * The facts being undisputed, we are free to disturb the Commission's conclusion only if it lacks any rational and statutory foundation." 332 U.S. 207, 67 S.Ct. 1582, 1760, 91 L.Ed. 1995.

Applying the tests thus outlined, we find no difficulty in concluding that the matters now before us and which were before the district court, in the language of the Central-Illinois case, supra, "do raise legal issues" in the broad sense in which that term must be used when we consider the appropriate scope of court review.

The action of the Commission was not in accord with what appears to be the later and we believe the better view with respect to the allowance of counsel fees in corporate reorganization matters, even where a divided allegiance has been demonstrated. We refer to such cases as Silbiger v. Prudence Bonds Corporation, 2 Cir., 180 F.2d 917, 920, and Berner v. Equitable Office Building Corporation, 2 Cir., 175 F.2d 218, in which the court declined to approve an entire forfeiture of the attorney's allowance.[6]

We find nothing in the situation present here which would call for any special, com-

---

6. In the Silbiger case the fee was paid entirely from the award to the favored party, a fact emphasized in the opinion. There Silbiger was found guilty of a dual representation, appearing for separate bondholders with conflicting interests. Since Cogan's suggestion of a retainer was never acted upon, a dual representation never occurred. The court could well regard Cogan's conduct as far less egregious than that of either Silbiger or Berner, in those cases. Under the circumstances here, Cogan's fee must necessarily come from the funds available to those he represented, just as Silbiger's came from those to whom he owed the primary duty.

mission-made standard of professional ethics or of fiduciary duty. For many generations the courts of equity have been dealing with these problems of fiduciary duty and of the effect of breach thereof upon the fiduciary's compensation, in a wide variety of cases and in connection with a multitude of circumstances. The able and learned district judge was, we think, as well qualified to pass upon what are the proper standards of professional conduct, and to arrive at appropriate conclusions as to Cogan's act, as was the Commission. If any "expertise" was involved, it belonged to the district judge because of his familiarity with the ancient standards of proper fiduciary conduct as long established in the courts of equity. The standards of professional ethics and fiduciary duty are inflexible; they do not vary with the forum; and we reject the suggestion that they are something different when the Commission is concerned than they are when judged elsewhere. And so, just as in the first Chenery case the Supreme Court because of its superior knowledge of the principles established by courts of equity, rejected what the Commission said of those principles, so here we think it manifest that the district judge knew more about the subject in hand than did the Commission. We think that the trial court applied the sound rule.

The holding of the Central-Illinois case that rules of law applicable in cases of this character are properly determined by the reviewing court has been, if anything, reinforced by the adoption of the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq. In Universal Camera Corp. v. Labor Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, the Supreme Court had occasion to discuss at length the extensive criticisms of what Congress and the members of the bar had come to regard as too contracted a reviewing power in the courts with respect to administrative orders. The court noted the reports of various committees expressing dissatisfaction with the existing standards as to the scope of judicial review and after reference to the committee reports concluded that by the adoption of the Administrative Procedure Act, (as well as by the adoption of the Taft-Hartley Act, 29 U.S.C.A. § 141 et seq., which was there involved), Congress had "expressed a mood" that in the future courts must assume more responsibility for review of administrative orders than they had in the past. Of course the Universal Camera case was dealing with the problem of an enlarged review of fact determinations. But we would blind ourselves to reality if we did not recognize that the extensive criticisms of the courts which led to the adoption of the Administrative Procedure Act were not limited to the courts' failure to function merely in cases involving fact determination.[7]

In enacting the Administrative Procedure Act Congress did not merely express a mood that questions of law are for the

7. In footnotes 7 and 8 on page 479 of 340 U.S. on page 460, of 71 S.Ct., the court referred to "protests against 'shocking injustices'" and "intimations of judicial 'abdication'" which had been expressed by Judge Evans of the seventh circuit and Judge Learned Hand of the second circuit. Equally vigorous was the protest of Judge Hutcheson in Duquesne Warehouse Co. v. Railroad Retirement Board, 2 Cir., 148 F.2d 473, 477. That was directed not to the failure of the courts to function with respect to fact determinations but to an attempted extension of the rule of National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170, and of Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301, forerunners of the second Chenery case. It seems fair to say that when Congress enacted the Administrative Procedure Act it was not unaware of a large segment of legal opinion for which Judge Hutcheson spoke when he said: "But, says the Board in effect, the question is not what the courts think the act under construction here means, it is what the Board thinks it means, and the Board has spoken. Thus by virtue of being constituted the Board to administer the act, the Board has been endowed with a prescience, invested with a prepotence, in respect of statutory construction to which the courts must bow, though the facts are undisputed and the question is entirely one of law. Thus by the simple expedient of having a lawyer, under the dignified name of General Counsel for the Board issue an opinion and then adhering by a bare majority to that opinion, the Board is enabled to read the statute as it will." [148 F.2d 477.]

courts rather than agencies to decide,—it so enacted with explicit phraseology. Section 10 provides: "Except so far as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion—[Neither of these exceptions applies here] * * * (e) Scope of review. So far as necessary to decision and where presented *the reviewing court shall decide all relevant questions of law,* interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of any agency action. It shall (A) compel agency action unlawfully withheld or unreasonably delayed; and (B) hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, an abuse of discretion, *or otherwise not in accordance with law * * *."* (Emphasis supplied.) As the Congressional committees stated in reporting the bill: "This subsection provides that questions of law are for courts rather than agencies to decide in the last analysis and it also lists the several categories of questions of law."[8] Surely this Act gives no warrant for any strained extension of the doctrine of the second Chenery case to the facts here.

█ We think that the district court properly considered and applied the rules here referred to, and that in doing so it arrived at the correct view of the law. The case of Woods v. City Nat. Bank and Trust Co., 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820, upon which the Commission relied, is not in point here. In that case the court dealt with a rule applicable to "an actual conflict of interest". Since the retainer suggested by Cogan never occurred, there was no such conflict of interest here.

Accordingly, it is the judgment of the court that the orders here appealed from and all of them be affirmed.

DENMAN, Chief Judge.

I concur in the opinion. I am also of the view that just as on demurrer the question whether the facts alleged in a complaint support a cause of action is one of law so is the question whether the facts proved support a finding. The Commis-sion's application for enforcement states a finding which I ignored in the opinion we are modifying. Paragraph 16 states that the Commission *found* as justification for disallowing Cogan's fee "that Cogan gave such attention to his personal interests and the fees which he hoped to secure, that his obligation of undivided loyalty to the stockholders whom he represented was not fulfilled."

The facts are that Cogan procured for his stockholders an agreement from his opponents for a settlement of their claims which the Commission's application in paragraph 25 states is "fair and equitable to the persons affected thereby." The facts showing such fairness and equity are set forth in detail in Exhibit J attached to the Commission's application.

The facts showing the success of Cogan in producing such "fair and equitable" and highly beneficial decision for his stockholder clients gives no substantial support to the Commission's finding that "his obligation of undivided loyalty to the stockholders whom he represented was not fulfilled." Indeed, the facts supporting the finding that he secured for them so successful a result negatives the finding of non-fulfillment of his obligation of loyalty to his clients.

BONE, Circuit Judge (concurring).

I agree with Judge Pope's conclusion that the measure of the attorney's duty to his client is a question of law for ultimate determination by reviewing courts. However, I agree with Chief Judge Denman that the vital issue here is whether, as the Commission found, Cogan was *in fact* actually guilty of divided loyalty. On this, as on other issues of fact, our scope of review is limited to a determination whether (on the whole record) this finding is supported by substantial evidence. If there was a suggestion of "divided loyalty", the Commission gave it a most peculiar complexion by finding that the end result in this case was a settlement that was "fair and equitable." For the reasons pointed out in Chief Judge Denman's concurring opinion, I do not believe that the finding of divided loyalty can be sustained.

8. Senate Document 248, 79th Congress, second session, pp. 214, 278.