In re CENTRAL STATES ELECTRIC CORP.

No. 16–620.

United States District Court
E. D. Virginia, Richmond Division.

April 2, 1953.

Austrian & Lance, New York City, Harry Reiss Axelroth, Philadelphia, Pa., B. Gray Blake and John H. Bocock, Richmond, Va., Boyle, Feller, Stone & McGivern, New York City, Robert G. Butcher, Richmond, Va., Trustee, Cahill, Gordon, Zachry & Reindel, New York City, Stuart G. Christian, Richmond, Va., Leonard L. Cowan, Chicago, Ill., Leslie Craven and Lewis N. Dabney, Jr., New York City, Denny, Valentine & Davenport, Richmond, Va., Thomas C. Egan, Philadelphia, Pa., Thomas B. Gay and Virgil R. Goode, Richmond, Va., Goolrick & Ashby, Fredericksburg, Va., W. Gibson Harris, Richmond, Va., Daniel O. Hastings, Wilmington, Del., Hodges, Reavis, Pantaleoni & Downey, New York City, Hunton, Williams, Anderson, Gay & Moore, Richmond, Va., Karelsen, Karelsen & Rubin, Isidor J. Kresel, Larkin, Rathbone & Perry, S. J. Levitan and Aaron Lewittes, New York City, David J. Mays, Richmond, Va., Samuel A. Mehlman, Milbank, Tweed & Hope, Milbank, Tweed, Hope & Hadley, S. Weldon O'Brien, Rathbone, Perry, Kelley & Drye, C. Frank Reavis and George A. Rosier, New York City, W. H. Shook, Dallas, Tex., Max Siskind and Sullivan & Cromwell, New York City, Tucker, Mays, Cabell & Moore, Charles S. Valentine and Wallerstein, Goode, Drewry & Adamson, Richmond, Va., Wilkie, Owen, Farr, Gallagher & Walton, Wilkie, Owen, Otis, Farr & Gallagher, New York City, Sam B. Witt, Jr., Richmond, Va., Wright, Gordon, Zachry, Parkin & Cahill, New York City, for claimants.

STERLING HUTCHESON, Chief Judge.

This proceeding was initiated on February 26, 1942, when the debtor, by its counsel, Thomas B. Gay, Esquire, filed a petition for reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq.,

which petition was approved on the following day. Messrs. J. Cloyd Kent and J. Harvey Wilkinson were appointed trustees, and Stuart G. Christian, Esquire, was appointed counsel for the trustees. In August 1942, Mr. Wilkinson resigned and Mr. Overton D. Dennis was appointed trustee in his place.

At the time the petition was filed the assets of the debtor, which was an investment trust corporation, had a market value of approximately $1,400,000. The outstanding debenture liabilities were in excess of $18,000,000. There was an issue of 7% preferred stock of the par value of $6,880,-000, upon which $9,500,000 of dividends had accrued at the time the plan of reorganization was consummated. 6% preferred stock, with a par value of $14,181,000 was outstanding, upon which at the date of consummation of the plan dividends had accrued in the amount of approximately $18,000,000. There was also outstanding common stock in the amount of 10,105,023 shares. Mr. Harrison Williams owned a majority of the common stock.

The assets of the debtor consisted primarily of 70% of the common stock (termed "Class B") of American Cities Power and Light Corporation, and 31% of the common stock of Blue Ridge Corporation. These companies, also investment trusts, will be hereafter referred to as American Cities and Blue Ridge, respectively. American Cities owned 42% of the common stock of Blue Ridge. Among the assets of the the debtor were also 66,521 shares of common stock of The North American Company, which constituted an important asset of its securities owned exclusive of the inter-corporate holdings. The assets of American Cities consisted principally of stocks of public utilities, primarily of The North American Company, and Blue Ridge's assets were rather widely distributed but it had substantial holdings of The North American Company.

Beginning late in 1942 the advance in stock market prices had a pronounced effect upon the market value of the assets held by the debtor. By the end of 1943 those assets had increased in value to the point where they were worth in excess of $10,000,000, and by the end of the following year their value had increased to approximately $21,-000,000.

In 1943 the trustees filed a report criticizing the former management for bad judgment and unsound practices in the management of the debtor mentioning two transactions which they believed might be the bases for a cause of action, but in view of the lapse of time the trustees and their counsel were of opinion, and so reported to the Court, that such action would be barred by the Statute of Limitations. The committee representing the 7% preferred stockholders urged that there be a further investigation of the suspected misconduct of the former management but the trustees' report was confirmed by the District Court and the 7% Committee prosecuted an appeal. Committee for Holders of Central States Electric Corp., etc., v. Kent, 4 Cir., 143 F.2d 684. Upon appeal the United States Court of Appeals, Fourth Circuit, reversed the action of the District Court and remanded the case in order that a further investigation might be conducted by a disinterested expert familiar with intercorporate dealings and indicating that the possibility the Statute of Limitations might be pleaded should not prevent the institution of suit. Following that decision Mr. Carl J. Austrian was appointed trustee on November 15, 1944. After his appointment Mr. Austrian became a director of American Cities and Blue Ridge, along with the former trustees and Messrs. Hugh B. Baker and C. A. Johnson, the latter two having been associated with the former management. Mr. Austrian interposed objections to the reelection of Messrs. Baker and Johnson. Messrs. Kent and Dennis believed they should be retained in office. The position of Austrian was upheld and Kent and Dennis resigned on March 20, 1945. Robert G. Butcher, Esquire, was then appointed to act as trustee, along with Mr. Austrian.

In the meantime the advance in stock market prices continued and by the end of 1945 the assets of the debtor were valued in excess of $34,000,000.

In the meantime Austrian later joined by Butcher, conducted an elaborate investigation of the transactions of the former management, pursuant to the mandate of the United States Court of Appeals, Fourth Circuit, and in July 1945 a suit was authorized and instituted in the District Court for the Southern District of New York against Harrison Williams, and others, who constituted members of the former management. This will be hereinafter referred to as the Williams suit.

Subsequently, Blue Ridge and American Cities filed suits against the debtor in New York. There was other litigation involving the estate. In addition there were a number of motions made and argued respecting various phases of this proceeding, including efforts to have the debtor declared insolvent and to proceed with liquidation; and later to declare the debtor solvent and return the corporation to the stockholders. Several appeals other than Committee for Holders of Central States Electric Corp., etc., v. Kent were taken from the decisions of this Court.

For the purpose of this discussion a detailed recital of the issues involved in this litigation is unnecessary but it is mentioned for background purposes and to indicate the complexities of this Chapter X proceeding.

The value of the assets of the debtor reached a peak of approximately $40,000,000 in 1946 and a problem arose of whether to reduce the risk of a market decline by the elimination of what is known as "leverage", or to reinvest proceeds of sale of assets in securities with the hope of further advancement in the market. The trustees recommended the more conservative course of using a part of such funds to retire senior securities and reduce bank loans of the subsidiary companies. This course was approved by the Court and in 1947 and 1949 a partial distribution to the debenture holders of the debtor was made in the amount of $5,400,000. During the meantime the value of the assets varied with fluctuations in the stock market and in 1950 the values reached approximately $37,000,000 where it remained until the date of consummation of the plan for reorganization on June 28, 1951, at which time the plan recommended by the trustees and approved by the Securities and Exchange Commission with some modifications was adopted. I do not deem it necessary to discuss the details of the plan which is fully disclosed in the record, further than to mention that the debenture holders received full value for their securities and the 7% preferred stockholders received in exchange for their shares securities of the value of about $196 for each share having a par value of $100. This did not pay the 7% preferred stock face value with accrued dividends and certificates or "stubs" were issued for the balance in event additional assets became available. The Williams litigation was then undetermined and provision was made for participation in any recovery there by the 7% in full of balance due and the residue to the holders of the 6% preferred stock.

Since the consummation of the plan the Williams suit was decided by the United States District Court for the Southern District of New York, Austrian v. Williams, 103 F.Supp. 64, in such manner as to result in a recovery on the part of the trustees of an amount approximating $20,000,000, if collectible. However, on appeal the United States Court of Appeals, Second Circuit, 198 F.2d 697, reversed the District Court's decision and upon application by the trustees the Supreme Court denied certiorari, 344 U.S. 909, 73 S.Ct. 328. Thus, this long drawn out litigation has been terminated adversely to the contention of the trustees.

All other matters pertaining to the proceeding have been finally wound up with the exception of compensation to the various parties who have participated as trustees, counsel, members of committees and experts. There have been filed for action fifty applications for compensation. Some of the applications were joint, filed on behalf of more than one individual. The total amounts requested as fees aggregate $3,474,876, and as allowable expenses $70,470.56.

The Securities and Exchange Commission, at the request of the Court, has filed a

memorandum containing its recommendations with respect to the applications. The amount of fees recommended by the Commission totals $1,111,250, and allowable expenses in the amount of $19,201.12. Both the amounts requested and recommended as fees include certain interim allowances heretofore made to the trustees and their counsel, and compensation paid, or agreed to be paid, counsel for the debtor and counsel for certain security holders by their clients.

By order entered April 23, 1951, the Court directed that there be reserved from the assets of the debtor in the reorganization the sum of $1,500,000, as the maximum amount allocable for the payment of allowances and expenses in addition to the amounts theretofore awarded.

The proceeding was on the docket of Judge Robert N. Pollard from its inception until his retirement in 1947, at which time it was placed on my calendar.

As is evident from the foregoing somewhat lengthy but nevertheless sketchy outline, the hope of the junior security holders to participate in any distribution or reorganization was, from the beginning, dependent upon delay with the possibility of a rise in the stock market.

Throughout the proceedings there has been constant pressure from the representatives of those securities which were "above water" to effect a prompt reorganization and, so long as effective barriers against such reorganization existed, to reduce the hazards of market fluctuations by eliminating what is known as "leverage" from the portfolio of investments. That is, by recommending a program of selling speculative stocks which are acutely susceptible to changes in market conditions and using the proceeds to retire indebtedness and to invest in securities of a more substantial and conservative nature.

Upon the other hand, the representatives of those whose securities were of junior dignity, which in event of liquidation or reorganization would not participate due to insufficient assets, urged upon the Court and the trustees a program under which the funds would be invested in securities having the highest potential dollar value in event the trend of the market should continue upward.

As is readily apparent the junior security holders, at the time, had nothing to lose by such a program but high stakes to win in event the inflationary spiral continued. At the same time the senior security holders whose investments had then reached full face value, stood to lose their secure position and possibly find themselves again reduced to the unfortunate situation confronting them when the petition was filed.

The Court and the trustees were in agreement upon the view that it is not the function of fiduciaries to retain or invest trust assets in securities of a highly speculative value although recognizing the fact that the object of the proceeding was to reorganize the investment company as a going concern rather than to liquidate. Consequently, a somewhat conservative policy was pursued for the purpose of taking advantage of such stock market advances as seemed reasonably safe but bearing in mind the probability that a turn in the other direction might occur at any time, with resulting consequences disastrous to the estate.

Subsequent events have demonstrated that the more daring policy would have resulted in greater benefit to the junior security holders, although at the risk of setting an undesirable precedent for fiduciaries which is contrary to sound fiduciary practices.

The trustees are to be commended for the course they recommended to the Court and for the careful and painstaking consideration they gave to the realities of the situation.

During this time, as was inevitable, the hopes and desires of the various groups of representatives varied. When the assets reached the point where the debentures could be paid, the holders of those securities had nothing to gain by delay, but the holders of the 7% stock, those who held 6% stock and the owners of the common stock had a close community of interest in inter-

posing reasons for delay. Their activities, sparked by the 7% Committee resulted in great gains to the holders of that stock, which increased in market value from about 30¢ per share to more than $190 per share.

When the 7% reached this enviable position they felt a keen sympathy for the plight of the holders of debentures who during this period had been compelled to stand by and watch the delaying activities under which their money was used as capital working for the benefit of junior security holders. No longer did they feel concern for the 6% and the common stock, although the latter two were deeply concerned in delaying the final day as long as possible.

In that situation it was only natural that those whose fortunes were in the same category would act in concert. These circumstances have been mentioned at some length because of criticism which has been leveled at some of the representatives of security holders for alleged cooperation among themselves by representatives of different types of securities.

While it would appear that some of those participating behind the scenes did not disclose their full status to the Court nor to those who acted for them in a representative capacity,[1] it is my conclusion that there has been no conduct on the part of those who will be named hereafter in the list of allowances for compensation or expenses of such a nature as will completely bar them from participating. It would appear that in some instances a greater vigilance might have led to the discovery of overlapping interests; but I can not say that the activities of such representatives would or should have been changed and it is now clear that the final result would not have been different.

In undertaking to evaluate for the purpose of allowing compensation the services rendered by the various applicants I have found the memorandum filed by S.E.C. of great value. It contains a full and careful analysis of the activities of the applicants and is especially helpful in so far as it relates to such activities prior to 1947, when the case was placed on my docket upon the retirement of Judge Pollard. While, as will be seen, I do not agree with all the conclusions reached by the Commission, I desire to express my thanks for the assistance the memorandum has been to me and my appreciation of the painstaking work of Messrs. Greene and Cohen, not only in this connection, but throughout the entire proceeding since it has been before me.

In dealing with the claims of the various applicants I shall not undertake an extended discussion of my reasons for arriving at the amounts awarded in individual cases, although some of them will be referred to more specifically than others. In reaching my determination of these questions I have considered the recommendations of the S.E.C., statements and testimony of the parties involved, my own observation of the conduct of the case since it has been on my docket and such other factors as to me appear relevant. In fixing the amounts I have taken into consideration the value of services rendered the estate as well as the efforts of the parties, bearing in mind that in some instances the results were unproductive but thorough and diligent and in some instances more diligence might have been profitable.

Reference has been made to the successful efforts of the representatives of the 7% stockholders resulting in a delay beneficial to the estate.

In light of the recommendations of the Commission under its interpretation of Section 249 of Chapter X as applied to this proceeding, a brief discussion of the applications filed by those representatives becomes desirable.

1. It should not be overlooked that some of the parties concerned were the owners of securities of the debtor of more than one issue. It can not be said that such owners should be expected to devote their entire efforts to protect only one type of investment so as to sacrifice the others; and I know of nothing which has occurred in this proceeding to indicate that there has been any injury to the debtor flowing from the actions of those who owned securities of more than one issue.

The attorneys for the Committee will be first considered. Of that group, Thomas C. Egan, Esquire, who has been referred to as Chief Counsel for the Committee, purchased and sold 400 shares of American Cities "B" stock and 3000 shares of Blue Ridge common, resulting in a profit of $10,-064; Harry Reiss Axelroth, Esquire, did not deal in any of the securities involved but Mrs. Axelroth purchased 300 shares of Blue Ridge common for $787. David J. Mays, Esquire, of the firm of Tucker, Mays, Cabell and Moore, purchased and sold 400 shares of American Cities "B" and 500 shares of Blue Ridge common for a loss of $150. One of Mr. Mays' partners and the wife and son of another partner bought and sold stock of a subsidiary company in relatively small quantities.

■ Under this state of affairs the S.E.C. contends that these attorneys by the provisions of Section 249 of the Act are precluded from receiving any compensation, it being the view of the Commission that the prohibition against dealing in "claims against, or stock of, the debtor" covers dealing in securities of the subsidiaries. With this contention, I do not agree.

■ In the absence of statute, a court has the long established discretion to determine and regulate compensation of those acting in a fiduciary capacity under its direction. By Section 249 Congress has placed a prohibition upon the allowance of compensation to a "committee or attorney, or other persons acting * * *" who has purchased or sold "claims against, or stock of, the debtor" or who has "a beneficial interest, direct or indirect" "acquired or transferred by him or for his account, after the commencement of [the] proceeding" and "for whose account such claims or stock have * * * been otherwise acquired or transferred".

It is to be noted that the prohibition relates to "claims against, or stock of, the debtor".

■ Under the Commission's theory the stock of a subsidiary is a claim against the debtor. If this reasoning is followed to its logical conclusion, one who deals in the stock of any corporation in which the debtor also holds stock is precluded from receiving compensation; for example in this case, North American. I have not found any controlling authority directly in point, but in my opinion such an interpretation is not justified nor do I believe this was the intention of the framers of the Act.

■ It is to be remembered that there is nothing inherently wrong in dealing in securities and claims so long as the estate does not suffer as a consequence, but it is realized that permission to do so may present temptation to deal to the detriment of the estate and thereby induce a conflict of interest between the estate and the personal fortunes of the fiduciary. Consequently, as a matter of sound policy it has long been recognized that such practices are frowned upon. Now Congress has seen fit to place a statutory prohibition against allowances in specified cases but it has limited the provision to cases involving claims against or stock of the debtor, leaving the Courts free to exercise the discretion long vested in them to regulate compensation in other cases. In exercising that discretion the Court quite properly may diminish the amount which would otherwise be allowed because of such transactions, without inflicting the penalty imposed by the Statute.

■ In the present case there is no indication or suggestion that either the 7% preferred stockholders or the estate of the debtor as a whole has been prejudiced in any manner by these transactions. At the same time it is clear that the 7% stock has been brought from an almost hopeless situation largely by the activities of the representatives of those holding it. While it is the better policy to refrain from dealing in such securities, it is my opinion that to deprive these applicants of justly earned compensation under the facts here existing would result in unwarranted hardship.

I shall therefore allow compensation to those above named as later set forth.

I have discussed the last mentioned group of applicants in some detail since their

situation is decidedly different from any others.

In dealing with the other applications I shall do so in more general terms.

■ The prohibition against dealing in claims against or stock of the debtor is a sweeping one and in this instance its application results unfortunately for some of those involved. From the record and the occurrences during the course of the proceeding it is evident that some of the applicants whose claims are clearly barred are among those primarily responsible for the highly fortunate position in which the 7% stockholders found themselves when the reorganization plan was consummated. Among them is one of the first to realize the possibilities of the assets of the debtor who was alert, aggressive and diligent in pressing the claims of those he represented. His technical knowledge and industry contributed greatly to the benefit of these security holders and there is nothing in the record to indicate any division of allegiance on his part nor has anything of the kind been suggested.

However, dealing in securities on the part of these applicants and members of the immediate family of some of them seem to preclude them from being compensated. This conclusion is reached with reluctance but it appears inescapable.

Certain applications are opposed by the S.E.C. on various grounds. In some instances it takes the position that the statute referred to is a direct prohibition against the allowance of compensation, as to some it is contended that no compensable services have been performed, as to some the contention is made that the applicants have been fully compensated and as to others the S.E.C. recommends allowances in amounts less than those requested, and in still others it is contended that the applicant should be denied compensation because he is in an equivocal position respecting representation of conflicting interests.

I do not deem it necessary to go into a lengthy discussion of the separate claims. In some instances the reasoning of the S.E.C. coincides with mine; in others I am not in agreement; and in between I find myself in some instances partly in agreement. It follows that the allowances made are based upon my conclusions after weighing as fully as I can the various factors which to me appear controlling.

There have been extended hearings of testimony and argument and elaborate briefs dealing with the subject filed. In addition the S.E.C. memorandum referred to consists of seventy-five pages with forty-eight pages of appendices and schedules attached.

To undertake a complete analysis of the services for which compensation is claimed and statement of reasons upon which my conclusion is based in individual cases would necessitate a discussion which would be inordinately long and no useful purpose would be served thereby.

■ Suffice it to say that I have considered the time spent over a number of years, the efforts and diligence of the applicants, the complexities of the questions presented, the amounts involved and the results obtained. Recognizing the distinction between hindsight and foresight it is my view that errors of judgment in opinions entertained and voiced at different stages should not be penalized; for example, able counsel disagreed as to the advisability of the Williams litigation. Able judges also entertained different views in that case. While the result so far as recovery is concerned has been barren of benefit to the estate and the cost has been considerable, at the same time had the litigation not been brought it is highly probable the reorganization would have been effected or a liquidation ordered at a time when the assets were of far less value than when the plan was consummated. This is a fortuitous circumstance due to the successful efforts of the junior security holders to delay the proceedings for which it is somewhat difficult to place real credit.

The following allowances will be awarded those named in the amounts shown, in full of services rendered including, but not in addition to, such sums as heretofore have been advanced to them on account of such services:

## Schedule of Allowances

| Applicant | Fee Requested | Fee Recommended by S.E.C. | Fee Allowed | Expenses Allowed |
|---|---|---|---|---|
| Carl J. Austrian and Austrian and Lance, Trustee and Attorneys for Trustees | $675,000 | $480,000 | $480,000 | –0– |
| Robert G. Butcher, Trustee | $250,000 | $160,000 | $200,000 | –0– |
| George Rosier, Counsel for Trustees | $325,000 | $220,000 | $250,000 | $2,312.39 |
| Wilkie, Owen, Farr, Gallagher & Walton, New York Counsel for Boyce Debenture Holders Committee | $150,000 | $ 55,000 | $ 75,000 | $1,806.20 |
| Charles S. Valentine, Richmond counsel for Boyce Committee | $ 25,000 | $ 10,000 | $ 10,000 | $ 196.10 |
| Boyce Debenture Holders Committee | $ 50,000 | | | $3,277.63 |
| Heyward E. Boyce | | $ 3,500 | $ 3,500 | |
| Alfred H. Hauser | | $ 5,000 | $ 5,000 | |
| Allen K. Brehm | | $ 250 | $ 250 | |
| Cecil P. Steward | | $ 750 | $ 750 | |
| Williams, Mullen, Pollard & Rogers, Richmond counsel for Reeve Debenture Holders Committee | $165,000 | $ 65,000 | $ 65,000 | $2,124.74 |
| Ralph T. Reeve, Chairman, Reeve Committee | $ 40,000 | $ 12,500 | $ 12,500 | $1,391.30 |
| Norman S. Mellon, Former Member, Reeve Committee | $ 1,500 | $ 500 | $ 500 | $ 397.75 |
| James H. Sachs, Member, Reeve Committee | $ 15,000 | $ 3,500 | $ 3,500 | $1,052.07 |
| Solomon E. Star, Secretary, Reeve Committee | $ 20,000 | $ 4,000 | $ 4,000 | –0– |
| Lionel D. Edie & Company | $ 2,320 | $ 2,000 | $ 2,000 | $ 69.75 |
| Abner H. Goldman, Counsel for himself and another debenture holder | $ 1,000 | –0– | –0– | $ 300.00 |
| Rathbone, Perry, Kelley & Drye, Counsel for The Hanover Bank, Indenture Trustee | $ 15,000 | $ 10,000 | $ 10,000 | –0– |
| The Hanover Bank, Indenture Trustee for 5% Debentures | $ 9,815 | $ 3,500 | $ 3,500 | $ 771.91 |
| Milbank, Tweed, Hope & Hadley, Counsel for The Chase National Bank, Indenture Trustee | $ 12,500 | $ 10,000 | $ 10,000 | –0– |

| Applicant | Fee Requested | Fee Recommended by S.E.C. | Fee Allowed | Expenses Allowed |
|---|---|---|---|---|
| The Chase National Bank, Indenture Trustee for 5½% Debentures | $ 4,500 | $ 4,500 | $ 4,500 | $ 721.94 |
| McGuire, Eggleston, Bocock & Woods, Richmond Counsel for The Chase National Bank | $ 1,500 | $ 500 | $ 500 | –0– |
| Thomas C. Egan, Harry R. Axelroth, *Francis E. Walter and Tucker, Mays, Cabell & Moore, Counsel for 7% Preferred Stockholders Committee | $750,000 | –0– | $250,000 | $1,187.90 |
| Hubert J. Horan, Jr., Member 7% Preferred Stockholders Committee | One of group who requested $250,000. Application of other members denied. | $ 7,000 | $ 7,000 | –0– |
| Karelson, Karelson, Rubin & Rosenberg, and John Bocock, Counsel for Durrell 6% Preferred Stockholders Committee | $ 75,000 | $ 20,000 | $ 20,000 | $2,137.45 |
| Joseph F. Hewitt, Member Durrell Committee | $ 5,000 | $ 750 | $ 750 | –0– |
| James J. Mead, Member Durrell Committee | $ 5,000 | $ 750 | $ 750 | –0– |
| Boyle, Feller, Stone & McGivern, and James P. Reeves, New York counsel for Kelly 6% Preferred Stockholders Committee | $107,100 | –0– | $ 15,000 | $4,508.97 |
| Wallerstein, Goode, Adamson & Dobbins, Richmond Counsel for Kelly Committee | $ 14,425 | $ 4,000 | $ 4,000 | $ 54.53 |
| Hugh A. Kelly, Fred C. Rudge, John V. Robinson, and Edward Gould, Members Kelly Committee | $ 7,500 | –0– | $ 500 | –0– |
| James P. Reeves, Secretary, Kelly Committee | $ 4,000 | –0– | $ 750 | –0– |

*Application withdrawn but reinstated following decision S.E.C. v. Cogan, 9 Cir., 201 F.2d 78.

| Applicant | Fee Requested | Fee Recommended by S.E.C. | Fee Allowed | Expenses Allowed |
|---|---|---|---|---|
| Leonard L. Cowan, Chicago Counsel for Doyle Common Stockholders Committee | $ 60,000 | –0– | $ 2,500 | –0– |
| B. Gary Blake, Richmond Counsel for Doyle Committee | $ 5,000 | $ 750 | $ 750 | –0– |
| William P. Doyle as Committee for Common Stockholders | $ 30,000 | –0– | $ 750 | –0– |
| Hunton, Williams, Anderson, Gay & Moore, Counsel for Debtor | $ 80,000 | $ 27,500 | $ 35,000 | $2,887.36 |
| J. Cloyd Kent, Former Trustee | $ 68,000 | –0– | $ 20,000 | –0– |
| Overton D. Dennis, Former Trustee | $ 64,966 | –0– | $ 20,000 | –0– |
| Stuart G. Christian, Counsel for former Trustees | $ 93,000 | –0– | $ 25,000 | –0– |
| | $3,382,126 | $1,111,250 | $1,533,750 | $25,197.99 |

Such applicants as are not named in the foregoing schedule of allowances are denied compensation and expenses.

The agreements between Goolrick and Ashby, Esquires, and their clients for the payment of a fee of $10,000 and Harris Berlack, Esquire and Sam B. Witt, Jr., Esquire, and their clients for the payment of a fee of $10,000, both appear reasonable and in event the approval of the Court confirming those agreements should be deemed necessary an order will be entered accordingly.

Counsel for the trustees are requested to prepare draft of proposed order carrying into effect the decision herein set forth.

The trustees are also requested to submit a report containing their recommendations regarding disposition of the balance of the funds remaining in the registry of the Court to the credit of this proceeding.