230 F.2d 364
 Matter of CHICAGO & WEST TOWNS RAILWAYS, Inc., Debtor.
William J. FRIEDMAN and Maurice Rosenfield, Raymond B.
Morris and Marie C. Biossat, Trustee of Estate of Harry A.
Biossat, Deceased, Petitioners-Appellees, Joseph F. Elward
et al., Objectors-Appellants.
 No. 11391.
 United States Court of Appeals Seventh Circuit.
 Feb. 20, 1956.
Rehearing Denied March 19, 1956.
Writ of Certiorari Denied May 21, 1956.
See 76 S.Ct. 837.
 
 Edward S. Macie, Chicago, Ill., for appellants.
 Henry F. Tenney, Joseph Z. Willner, Reuben L. Freeman, Alfred B. Teton, Hyland J. Paullin, William J. Friedman, Raymond B. Morris, Chicago, Ill., for appellees.
 Before DUFFY, Chief Judge, and SWAIM and SCHNACKENBERG, Circuit judges.
 
 
 1
 DUFFY, Chief Judge,
 
 
 2
 This is an appeal, pursuant to leave granted, from an order of the District Court dated January 10, 1955, allowing a) William J. Friedman and Maurice Rosenfield the sum of $12,000 as compensation for attorney fees, and b) allowing Raymond B. Morris and Marie C. Biossat as Trustee of the Estate of Harry A. Biossat, deceased, the sum of $16,000 as compensation for attorney fees.
 
 
 3
 While this case was pending before us on appellant's motion for leave to appeal, the petitioner moved to dismiss the appeal. Extensive briefs were filed. On March 16, 1955, we denied the motion for dismissal. Petitioners have renewed the motion for dismissal. We have again considered the arguments presented and again deny the motion to dismiss the appeal.
 
 
 4
 The debtor, an Illinois corporation, was public utility which had been engaged in furnishing transportation inside of and between various suburbs west of the City of Chicago, including among others, Oak Park, Cicero and Berwyn. This proceeding was commenced by a voluntary petition filed by debtor on June 30, 1947, for reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq.
 
 
 5
 The debtor had outstanding first mortgage bonds totaling $2,124,800 bearing interest at 5%. On July 1, 1947, there was a default in the matured principal of the bonds and the semi-annual interest. This imminent default was the reason for the institution of the reorganization proceedings. There was also outstanding $1,000,000 par value of First Preferred 6% stock; $210,000 par value of Second Preferred 8% stock; and $1,000,000 par value common stock.
 
 
 6
 In September, 1947, two bondholder committees were permitted to intervene. One, known as the Leason Committee, was represented by attorneys Raymond B. Morris and Harry A. Biossat. The other bondholders' committee, known as the Friss Committee, was originally represented by Bell, Boyd, Marshall & Lloyd, but they withdrew because of possible conflict of interest. They were succeeded by Gottlieb, Schwartz & Friedman who later withdrew and were succeeded by Friedman, Zoline & Rosenfield, and William J. Friedman and Maurice Rosenfield, the latter two being members of the last-named law firm.
 
 
 7
 On April 27, 1948, the District Court appointed a Committee of seven, including the trustee, his attorney, and Messrs. Leason, Morris, Biossat and Friedman, to investigate the possibility of a sale or lease of debtor's property to Chicago Transit Authority. The court order contained the following provision: '* * * provided that the members of the committee, other than the Trustee, shall not constitute officers of the Court, and shall be entitled to only such compensation as the court may hereafter allow.'
 
 
 8
 After two years of negotiation the Committee reported to the Court that the Chicago Transit Authority was not interested in either purchasing or leasing debtor's property. The Court approved the Committee's report and stated in the order of approval: 'Said committee is empowered and directed to serve, subject to the provisions of said order of April 27, 1948, at the call of the Trustee, in order to confer and advise with the Trustee with reference to problems in the development of a plan of reorganization.'
 
 
 9
 On April 21, 1951, the Trustee filed a proposed plan for reorganization. Objections were filed thereto, and on April 24, 1953, the Trustee filed an amended plan which provided for a reorganization loan of $200,000; the reorganized debtor to issue fifty-year 4% income bonds; for each old $100 first mortgage bond there was to be issued a new $50 income bond plus 5 shares of common stock. The old common stock and preferred stock were eliminated.
 
 
 10
 On May 19, 1953, Chicago, Aurora and Elgin Railway Company (hereinafter called Aurora-Elgin) filed a proposed amendment to the Trustee's amended plan. Aurora-Elgin offered to purchase 51% of the debtor's stock for the sum of $200,000. Each holder of an old $1,000 bond would receive a $400 4% income bond and 50 shares of common stock. The amendment also proposed that of the 5-man Board of Directors, the Court was to select three from a list furnished by Aurora-Elgin, and two from a list furnished by the old bondholders. The proposed plan was to be consummated within 120 days.
 
 
 11
 The Aurora-Elgin plan was presented by Jack H. Oppenheim, an attorney who officed in the same suite with Friedman, Zoline and Rosenfield, which firm for years had acted as general counsel for Aurora-Elgin. One of the partners, Joseph T. Zoline, had been a director, secretary and counsel for Aurora-Elgin. The proposal was signed by the Chairman of the Board of Aurora-Elgin and was attested by Joseph T. Zoline, Secretary. Friedman testified Oppenheim was an independent lawyer, and that he did work for Aurora-Elgin '* * * both work which he gets from our firm and work which he gets from Aurora directly.' Friedman testified that the reason Oppenheim had been selected was because he (Friedman) realized his firm was in a position where there could be a conflict.
 
 
 12
 On June 23, 1953, a hearing was held before the Court for a determination of which plan or plans was 'worthy of consideration.' The attorney for the Trustee stated that both the Trustee's amended plan and the Aurora-Elgin amendment were 'worthy of consideration' and presented an order to that effect. Morris, attorney for one of the bondholders' committees, made substantially the same statement. Friedman and Rosenfield did not appear. Elward and Savage strongly objected, and asked the Court to rule that the Aurora-Elgin amendment was 'not worthy of consideration.' At the conclusion of the argument the Court ruled with the objectors.
 
 
 13
 On August 25, 1953, the Court approved the amended plan, and on December 4, 1953, entered an order confirming the plan. On July 2, 1954, the District Court entered an order directing the Trustee to turn over the trust estate, and the reorganized company has since been operating the system.
 
 
 14
 Under the plan as confirmed the reorganized corporation was to assume and pay all applications for compensation as allowed by the Court. A total of $162,000 was paid to the trustee, his counsel, the indenture trustee and its counsel. No objections were filed to the allowance of these amounts.
 
 
 15
 William J. Friedman and Maurice Rosenfield filed a joint petition asking an allowance of $14,000. Written objections were filed by the objectors. The Security and Exchange Commission (hereinafter called SEC) recommended the fees for these attorneys be fixed at $7,000; the Master recommended an allowance of $12,000. The District Court adopted the Master's recommendation.
 
 
 16
 Raymond B. Morris and the Trustee of the Estate of Harry A. Biossat filed a joint petition asking an allowance of $28,800. Written objections were filed. The SEC recommended an allowance of $16,000; the Master recommended an allowance of the same amount. The District Court approved.
 
 
 17
 It does not appear from the record before us why the District Court permitted two bondholder committees to intervene. There was only one issue of bonds. Any plan of reorganization would affect the bondholders represented by the Leason Committee in exactly the same manner as those represented by the Friss Committee. The result of having two bondholders' committees recognized by the Court was there was much unnecessary duplication of effort by committee members and by the attorneys representing the respective committees. Furthermore, many of the services for which charges were made were matters properly handled by the Trustee and his attorney. The original Trustee and his successor were entirely competent. They were allowed fees of $103,000. The attorneys for the Trustee were Sidley, Austin, Burgess and Smith, one of the prominent law firms of Chicago, and who were entirely competent. They were allowed fees of $53,500. In addition, during the period of the reorganization, the attorney for the debtor was allowed fees of $133,000.
 
 
 18
 The District Court referred the petitions for allowance of fees to a Special Master. Perhaps such practice should not be criticized as to allowances under § 241, 11 U.S.C.A. § 641, of the Act. Under this section allowances may be made for the services of a referee, special master, the trustee and his attorney, the attorney for the debtor and the attorney for petitioning creditors. Reasonable fees for such services depend largely on the hours spent and the allowance per hour. However, allowances under §§ 242 and 243, 11 U.S.C.A. §§ 642, 643, are in a different category. Under § 242 the District Judge may allow reasonable compensation for services rendered by a committee of creditors, such as a bondholders' committee, or to attorneys representing same in connection with the administration of an estate or in connection with a plan approved by a judge. It is well established that mere participation by such a committee in reorganization proceedings does not create a right to compensation. The services must be beneficial to the estate. Dickinson Industrial Site, Inc., v. Cowan, 309 U.S. 382, 389, 60 S.Ct. 595, 84 L.Ed. 819; Gochenour v. Cleveland Terminals Bldg. Co., 6 Cir., 142 F.2d 991, 995; In re Mt. Forest Fur Farms Of America, Inc., 6 Cir., 157 F.2d 640, 646. It is apparent that a special master who knew nothing about the previous proceedings in the estate extending over a seven-year period would not be in as good a position to know what services had been beneficial to the estate as would the district judge who had lived with the reorganization for this period of years. A hearing before the reorganization judge should be of much shorter duration than would be necessary in order to acquaint a special master with all the background of a long drawn-out reorganization proceeding.
 
 
 19
 Allowances for Morris and Biossat.
 
 
 20
 Harry A. Biossat died, and the petition for allowances herein was filed jointly by Raymond B. Morris and Marie C. Biossat as Trustee of the Estate of Harry A. Biossat. The petition recited the employment of Morris and Biossat as attorneys for the Leason Committee. Petitioners requested a total allowance of $28,800. Biossat did not keep any record of the hours he spent as counsel for the Leason Committee, but compensation for estimated 300 hours of service was included in the petition.
 
 
 21
 The amount recommended by the Master and approved by the Court was the same amount as recommended by SEC. True, such recommendation by SEC was only advisory, but the Commission's recommendation represented the expert opinion of a disinterested agency skilled and experienced in reorganization affairs. Finn v. Childs Co., 2 Cir., 181 F.2d 431, 438. See also, Conway v. Silesian-American Corp., 2 Cir., 186 F.2d 201, 202-203; 6 Colliers on Bankruptcy, § 13.02, p. 4496, 14th Ed., 1947. Most judges in reorganization matters appreciate having before them the recommendations of SEC on reorganization matters.
 
 
 22
 The allowance or denial of fees in a reorganization proceeding under Chapter X is a matter within the broad discretion of the Bankruptcy Court. This Court, on appeal, does not try de novo the issues of reasonable compensation. In re 32-36 North State St. Bldg. Corporation, 7 Cir., 164 F.2d 205-206. Such allowances should not be disturbed unless there has been shown a clear abuse of discretion or such allowances were based on an error of law. In re West Counties Const. Co., 7 Cir., 182 F.2d 409-411. In so far as the District Court's order allows the fees of Morris and Biossat at $16,000, said order will be affirmed.
 
 
 23
 Allowances for Friedman and Rosenfield.
 
 
 24
 The Friedman-Rosenfield petition recites their employment as attorneys for the Friss Committee, and asserts that they spent 345 hours of compensable time and asked for an allowance of $14,000. Among the objections filed was that they were precluded from receiving any compensation because in the course of their services they represented an interest conflicting with of the debtor. Objections were also made that the claim was grossly excessive.
 
 
 25
 In view of the duplication of effort by the attorneys for the two bondholder committees we think the allowance of $12,000 was high. The SEC recommended an allowance of $7,000. However, in view of the wide area of discretion in the District Judge, we would be inclined to affirm the $12,000 allowance were it not for the serious question which is raised as to conflict of interest.
 
 
 26
 Throughout the reorganization, petitioners' law firm was general counsel for Aurora-Elgin. The appearance for the Committee was filed by the firm Friedman, Zoline and Rosenfield. Petitioners' partner, Zoline, was a director and also was secretary of that company. The proposal of Aurora-Elgin was signed by Zoline as secretary, and was presented by Attorney Oppenheim who officed with Friedman, Zoline and Rosenfield. During the cross-examination of Friedman by the attorney for SEC, the following appears:
 
 
 27
 'Q. How did it happen that this individual that you said prepared the proposed amendment to the plan, prepared it and filed it, rather than Mr. Zoline or you or someone else, who were counsel for the Chicago, Aurora & Elgin? A. Because we felt in view of the fact that I was a Court appointee on the West Towns we couldn't act for the Aurora in the matter, and so that was done.
 
 
 28
 'Q. The reason that somebody else, who just happens to share your office space, handled this matter in particular for the Chicago, Aurora & Elgin was that you realized your firm was in a position where-- A. Where there would be a conflict.
 
 
 29
 'Q. Where there would be a conflict? A. Right.'
 
 
 30
 Friedman also testified that Oppenheim had not previously done that kind of work.
 
 
 31
 That a conflict of interest did exist seems clear. The historic conflict of interest between a prospective seller and a prospective buyer was present. Even though it might appear advisable that control of the debtor should be sold to Aurora-Elgin, there would still be an inherent conflict as to price and terms. It was to debtor's interest to obtain the highest price and best terms; it was to the interest of Aurora-Elgin to purchase at the lowest possible price and the easiest terms. The petitioners and their partners would share in the fees received from representing Aurora-Elgin; they likewise would participate in the fees received as representing the bondholders' committee.
 
 
 32
 The device or strategy of having the Aurora-Elgin amendment presented by Oppenheim, an office associate, does not exonerate Friedman and Rosenfield from the impediment of the conflict of interest. Under the circumstances present it was impossible for them to avoid a dilution of the undivided loyalty which they owed to the bondholders' committee. By statute, the District Court was authorized to fix "reasonable compensation for services rendered", but that phrase 'necessarily implies loyal and disinterested service in the interest of those for whom the claimant purported to act.' Woods v. City National Bank and Trust Company of Chicago, 312 U.S. 262, 268, 61 S.Ct. 493, 497, 85 L.Ed. 820. See also, American United Mutual Life Insurance Co. v. City of Avon Park, Florida, 311 U.S. 138, 61 S.Ct. 157, 85 L.Ed. 91.
 
 
 33
 Petitioners point out that they did not appear before the Court on June 22, 1953 when the question was argued whether the proposed Aurora-Elgin plan was 'worthy of consideration.' However, we conceive it to have been the duty of petitioners representing the bondholders' committee to have been present and to have expressed their views upon this important proposal. The predicament which faced the petitioners well illustrates that a conflict of interest did exist.
 
 
 34
 When the conflict of interest arose in May, 1953, petitioners should have followed the example of Bell, Boyd, Marshall and Lloyd, and have withdrawn as counsel of the Friss Committee. Not having done so, they should be penalized in any allowance for fees that may be made. Authority exists for the disallowance of all fees. Woods v. City National Bank & Trust Company of Chicago, 312 U.S. 262, 269, 61 S.Ct. 493, 85 L.Ed. 820. But in several reorganization cases a less harsh rule has been adopted. A penalty of less than full forfeiture was approved in Silbiger v. Prudence Bonds Corporation, 2 Cir., 180 F.2d 917, 921; Berner v. Equitable Office Bldg. Corp., 2 Cir., 175 F.2d 218, 221. We may decide the extent of the penalty. Fuller v. Memphis St. Ry. Co., 6 Cir., 110 F.2d 577, 578.
 
 
 35
 Petitioners had rendered services of value to the Estate up to May, 1953. We think some reasonable allowance for such services should be made. We hold that the allowance for petitioners' fees as made by the District Court should be reduced by $5,000, and that petitioners should pay the costs on this appeal including all expenses for printer's fees for the record and briefs which were incurred by objectors, the appellants herein.
 
 
 36
 The order of the District Court allowing fees to Friedman and Rosenfield will be modified by reducing the amount of such allowance to $7,000. The costs of printing the record and the appellants' brief and reply brief will be taxed against appellees, Friedman and Rosenfield.