**In the Matter of FOOD TOWN, INC. and Kent Super Market, Inc., Arrow Foods, Inc., Super Market Management, Inc., Food City, Inc., Master Super Market, Incorporated, Food Town of Virginia, Inc., Super Akman's Market, Inc., Pik 'N Pay, Inc., Super Market Association, Inc., Apex Distributing Company, its subsidiaries, Debtors.**

**No. 11070.**

United States District Court
District of Maryland.

Aug. 31, 1962.

H. Vernon Eney, Baltimore, Md., for the trustees.

Aaron Levy, Assistant Director, Division of Corporate Regulation, and William W. Fulmer, Washington, D. C. (Nathan Markowitz, New York City, on the brief), for the Securities and Exchange Commission.

White & Case, New York City (Richard W. Roberts, New York City, of counsel) and Brune, Robertson & Iglehart, Baltimore, Md., for Arthur Young & Co.

Hilary W. Gans, Baltimore, Md., for American National Bank & Trust Company of Chicago, Illinois, debenture trustee.

Other applicants pro se.

THOMSEN, Chief Judge.

This Chapter X bankruptcy case is before the court on exceptions to the report and recommendation of the referee, sitting as a special master, to whom Judge Chesnut had referred 14 applications for the allowance of fees and ex-

penses.[1] The master took testimony, heard arguments, considered briefs and filed a careful 54-page report. Most of the applicants have excepted to the report, contending that the recommended allowances are too small, whereas the Securities and Exchange Commission has filed exceptions and objections contending that some of the allowances are too large and that some applicants are not entitled to any allowance at all. There is little if any dispute about the basic, historical facts found by the master, but much dispute about his inferences and conclusions, which produced his findings of ultimate facts and his recommendations.[2]

*Basic Facts*

On July 29, 1959, when the petitions for reorganization under Chapter X were filed, Food Town, Inc. and its ten subsidiaries (referred to collectively herein as the debtors or Food Town) were operating a chain of 15 supermarkets in Maryland, Virginia and the District of Columbia as an integrated enterprise. The consolidated balance sheet showed assets of $2,992,915.23, including leases, franchises and good will, and $2,820,523.53 liabilities. In addition, the holders of that part of the 8% preferred stock sold to the public for $206,508, contend that they are entitled to be treated as creditors.

A large majority of the common stock of Food Town is owned by Service Food Distributing Co. (Service Food). Peter Volid is the beneficial owner of most of the capital stock of Service Food; he is also the sole stockholder of King Korn Stamp Co. (King Korn). In 1959 Nicholas J. Constantine was secretary of King Korn, assistant secretary of Food Town and counsel for both King Korn and Food Town. Food Town had a contract with King Korn to use the latter's trading stamps, and King Korn holds the entire issue ($500,000) of debentures issued by Food Town, secured by a chattel mortgage on its physical assets. The security of those debentures is disputed by the trustee herein. King Korn also has a number of unsecured claims against Food Town, some or all of which are disputed by the trustee.

In the fall and winter of 1959–1960 most of the parties in interest knew that Constantine represented both King Korn and Food Town, and had learned facts tending to show that the same interests probably controlled the common stock of both companies, although the details had not yet been disclosed to or discovered by the trustee herein or his attorney. Various claims and counterclaims between the trustee and King Korn are pending, so no findings will be made herein with respect to the relationship between King Korn and Food Town except those necessary to decide the matters presently under consideration, and none of those findings will be binding on King Korn or the trustee when the claims and counterclaims come on for hearing.

The firm of Semmes, Bowen & Semmes was engaged by Constantine to prepare and file the Chapter X proceedings. Bradley T. J. Mettee, Jr., of that firm, and Peter Parker, a young associate, handled the case. At their suggestion, Judge Chesnut appointed George J. Lochner trustee and Fred T. Goodfellow, the president of Food Town, operating trustee. Irving B. Grandberg was appointed attorney for the trustees. On September 22, 1959, after a hearing, the trustees and their counsel were continued in their respective offices and the trustees were authorized to employ Arthur Young & Co., a national firm of certified public accountants, to assist them in the performance of their duties, particularly to make an audit. The court order also

1. Judge Chesnut has asked me to consider the report and exceptions and to fix the allowances.

2. General Order 47, 11 U.S.C.A. following section 53, applies in this case, as well as Civil Rule 53, 28 U.S.C.A., which is made applicable by General Order 37, but the parties are generally agreed that the judge should give greater weight to the master's findings of basic facts than to his findings of ultimate facts, and that the judge is charged with the responsibility of fixing the fees.

directed the trustees to submit a report under sec. 167 [3] and a plan of reorganization not later than December 31, 1959.

It soon became apparent that no equity existed for any class of stockholders, and that no party was willing to advance the necessary funds for an internal reorganization. Consequently, efforts were begun by the trustee and his attorney and by two committees of creditors and their respective counsel to interest several food chains in purchasing the assets. Meanwhile the trustees terminated Food Town's unprofitable warehouse operations, sold two of the supermarkets as going concerns and closed two others.

On October 6 Grandberg, the attorney for the trustees, outlined the scope of the work to be done by the accountants and said: "We are also interested in the King Korn Stamp Company relationship with the debtor. * * * There seems to be an ownership of the control of the common stock of the debtor, and that of the stamp company among the same people. Are there any irregularities as the result of this—is the company being run for the benefit of the stamp concern only? Any irregularities are to be reported."

The accountants replied that their initial effort would be directed toward a balance sheet audit as of July 29, 1959, but added: "During the progress of our audit services, I have in mind the desirability of submitting to yourself and the trustees such letter comments as seem appropriate covering the special matters mentioned in your two letters noted above."

In November the accountants reported to Grandberg that they were experiencing difficulty in obtaining records and that their work would not be finished before December 24. Since the trustee was required by order of court to file a report and plan not later than December 31, Constantine, the attorney for both King Korn and Food Town, obtained permission from Grandberg to try to "jack up" the accountants. He told them that the trustee had to have balance sheet statements by December 19, and requested audit comments on balance sheet items and a statement of irregularities, if any, ascertained in the course of the work. After confirming this with Grandberg, the accountants prepared a preliminary report, which was submitted to him on or about December 18. Grandberg wrote the accountants on December 26, stating that their preliminary report did not give enough information for the required report under sec. 167(5) of the Bankruptcy Act. He added: "We call your particular attention to the King Korn trading stamp transactions, the consideration for the debentures, and there was nothing in your report as to that, nor as to stock issuances, etc."

The accountants replied on December 28 that "comments regarding the King Korn matter still are incomplete to us because Food Town has been unable to provide us with certain accounting documentation even at this time". The court therefore granted the trustee an additional 90 days to file his report and plan.

On December 29 Constantine called the accountants and on behalf of the trustee asked them to furnish a letter reporting the results of their examination of the transactions relating to the debenture notes and to the common and preferred stocks of Food Town, Inc. The accountants prepared a draft of such a letter and it was presented at a meeting held in the offices of Semmes, Bowen & Semmes on December 30, at which Grandberg, Constantine, Mettee, Parker and representatives of the accountants were present. The draft contained, in addition to other information, the following paragraphs:

> "With respect to the notes in the amount of $300,000.00 dated April 1, 1959, we examined cash entries in the cash receipts records of the Company which indicate that three checks of $100,000.00 each were received from the American National Bank and Trust Company of Chicago

3. 11 U.S.C.A. § 567.

on April 16, April 22 and April 29, 1959 respectively. Remittance advices from the American National Bank and Trust Company of Chicago which accompanied two of these checks recorded as received on April 15 and April 29, 1959 were also examined. These remittance advices indicate that the purchaser of the debenture notes was King Korn Stamp Company, Inc. The statements of the Company's account with the American Security and Trust Company, Washington, D. C., indicated that three deposits of $100,000.00 each were made with that bank on April 24, April 27 and May 1, 1959, respectively.

"It should be noted that, on the same dates the above mentioned checks were received by the Company, three checks of $100,000.00 each were issued by the Company to King Korn Stamp Company, Inc. in payment of previously existing indebtedness."

The second paragraph led to considerable discussion. At the request of Constantine or Mettee, with the approval of Grandberg, the accountants agreed to delete the paragraph. The accountants' explanation for the deletion is contained in a letter to the SEC dated February 4, 1960, as follows: "None of the attorneys present questioned the accuracy of the above-quoted statement. They suggested, however, that this paragraph should be deleted because the payments by the Company referred to in this paragraph were not related to the 6% debentures purchased by King Korn Stamp Company, Inc. This paragraph, therefore, was deleted."

The attorneys who were present at the meeting disagree with the accountants' statement of the reason for the deletion. They offer various explanations, which need not be set out in detail. It is sufficient to note that all those present, including the accountants, were aware that the facts contained in the draft bore on the question of a possible preference which might affect the security of $300,000 of the debentures held by King Korn. Nevertheless, after the conference, the accountants prepared a final draft, in which the entire second paragraph was deleted, and mailed the original and eight carbons to Grandberg on January 4, 1960.

On January 7 the accountants informed Grandberg that it would take at least two or three more weeks before the data necessary to complete the audit could be provided. Grandberg directed the accountants to prepare a report based on audit procedures completed at that time and to submit the report by January 15. On January 12 the accountants conferred with counsel for the SEC, who raised the question whether the exchange of checks in April 1959 constituted a preference and suggested that the accountants consider consulting their own attorney. The accountants did not tell the SEC about what happened at the December 30 meeting, and their audit report, submitted on or about January 15, simply disclosed the date and amount of the debenture notes, the monthly instalments, interest rate, amount of interest in default, and the security of the trust indenture.

The accountants' report, dated January 7, 1960, contained a statement that due to uncompleted auditing procedures and limitations in the scope of their examination they had not followed generally accepted auditing procedures and were unable to express an opinion with respect to the accompanying statements. The report concluded:

"The ordinary examination incident to the issuance of an opinion respecting financial statements is not designed and cannot be relied upon to disclose defalcations and other similar irregularities although their discovery may result. Based on the incomplete auditing procedures, we report, pursuant to request of the Trustees, that nothing has come to our attention at this time to indicate significant irregularities, misconduct or mismanagement during the periods examined, except

that desirable controls for the maintenance of satisfactory accounting records has been lacking."

On January 19 Grandberg filed the trustee's report under sec. 167(1) and (5) of the Bankruptcy Act and the audit report of the accountants. On January 22 the SEC objected to the report as incomplete, and suggested that the final report of the accountants be included with the brief statement to be sent to creditors, stockholders, and other interested persons. This was done, and the creditors and stockholders were told that they might submit suggestions for the formulation of a plan on or before February 17.

Meanwhile, offers to purchase Food Town's stock or assets had been received from the Kroger Company, Greenbelt Consumer Services, Inc., American Stores and the Grand Union Company. The part which the creditors committees and their attorneys played in developing those offers will be discussed below, when their several requests for allowances are considered.

Although the attorney for the Washington committee (Greenbaum) had prepared a plan contemplating further competitive bidding, Grandberg, as attorney for the trustee, with the approval of the Washington committee, presented on February 19 a report and petition proposing a plan of reorganization based upon an offer submitted by Kroger. The plan called for the payment in full of the debentures held by King Korn. The SEC objected, charging bad faith and collusion on the part of Grandberg. After a conference with Judge Chesnut, Grandberg asked and was granted leave to withdraw as attorney for the trustee, and H. Vernon Eney was appointed in his place.

The new attorney for the trustee believed that a more advantageous offer could be obtained, and as a result of his efforts a much better offer (yielding $1,544,005.92 cash to the trustee) was received and was approved by the court.

The report of the master now under consideration sets out the further proceedings, the terms of the plan of reorganization and other material facts and figures, including the gross sales ($11,476,340.17), the operating costs and expenses ($11,658,412.34) and the administrative costs and expenses already paid ($99,500.06). A total of 596 claims have been filed, of which 583 have been allowed, in the total amount of $1,849,662.78, on which $365,910.57 has now been paid. The disputed claims total $880,393.89, most of which is represented by the secured and unsecured claims of King Korn. Cash on hand amounts to $1,201,088.47.

*Applicable Legal Principles*

The allowance of fees in Chapter X proceedings is controlled by secs. 241, 242 and 243 of the Bankruptcy Act, 11 U.S.C.A. §§ 641, 642 and 643, which provide:

"Sec. 241. The judge may allow reimbursement for proper costs and expenses incurred by the petitioning creditors and reasonable compensation for services rendered and reimbursement for proper costs and expenses incurred in a proceeding under this chapter—(1) by a referee; (2) by a special master; (3) by the trustee and other officers, and the attorneys for any of them; (4) by the attorney for the debtor; and (5) by the attorney for the petitioning creditors. Such compensation of referees and trustees shall not be governed by sections 40 and 48 of this Act.

"Sec. 242. The judge may allow reasonable compensation for services rendered and reimbursement for proper costs and expenses incurred in connection with the administration of an estate in a proceeding under this chapter or in connection with a plan approved by the judge, whether or not accepted by creditors and stockholders or finally confirmed by the judge—(1) by indenture trustees, depositaries, reorganization managers, and committees or representatives of creditors or stockholders; (2) by any other par-

ties in interest except the Securities and Exchange Commission; and (3) by the attorneys or agents for any of the foregoing except the Securities and Exchange Commission.

"Sec. 243. The judge may allow reasonable compensation for services rendered and reimbursement for proper costs and expenses incurred by creditors and stockholders, and the attorneys for any of them, in connection with the submission by them of suggestions for a plan or of proposals in the form of plans, or in connection with objections by them to the confirmation of a plan, or in connection with the administration of the estate. In fixing any such allowances, the judge shall give consideration only to the services which contributed to the plan confirmed or to the refusal of confirmation of a plan, or which were beneficial in the administration of the estate, and to the proper costs and expenses incidental thereto."

These sections must be read in the light of their historical development, discussed at length in 6 Collier on Bankruptcy, 14th ed., § 13.01, and of the cases construing them, which are summarized in Collier, §§ 13.02–13.12, especially 13.02, 13.06, 13.10 and 13.11.

Generally, it has been held that officers, such as trustees and their attorneys, are entitled to reasonable compensation for loyal and disinterested services rendered in the proceeding whether or not they can show the benefit to the estate which is required of other applicants. Even though the term "beneficial" appears only in sec. 243 and not in sec. 241 or sec. 242, it has been consistently held that a showing of benefit to the estate is a prerequisite of an allowance to the attorney for the debtor under sec. 241 or to indenture trustees, committees and their counsel under sec. 242. In re Porto Rican American Tobacco Co., 2 Cir., 117 F.2d 599; Dickinson Industrial Site, Inc. v. Cowan, 309 U.S. 382, 389, 60 S.Ct. 595, 84 L.Ed. 819; In Re McGann Mfg. Co., 3 Cir., 188 F.2d 110, 112; In Re Postal Tel. and Cable Corp., 2 Cir., 119 F.2d 861, 862; Chicago and W. Towns Ry. v. Friedman, 7 Cir., 230 F.2d 364, 367; In Re International Power Securities Corp., D.N.J., 112 F.Supp. 46, 54; In Re Vernon Mfg. Co., W.D.Pa., 92 F.Supp. 861, 864; 6 Collier, § 13.06, p. 4,536.

In the Porto Rican American Tobacco case, the counsel for the debtor argued that because he came under sec. 241 rather than sec. 243, he did not have to show that his services met the test of benefit to the estate. The court, speaking through Judge Swan, replied: "This argument cannot prevail. Section 242, authorizing compensation to indenture trustees, committees and other parties in interest, also contains no express provision that compensable services must be 'beneficial in the administration of the estate', yet it cannot be supposed that in all such cases the estate is to pay for unnecessary services. * * * Because some decisions under 77B treated with extreme suspicion, or rejected entirely, the claims for compensation of individual creditors or stockholders when the class to which they belonged was represented by a committee, section 243 was enacted to encourage participation by individuals who might contribute something of value to the plan or to administration of the estate. (citations omitted) But in so doing Congress was careful to specify that they should not be compensated from the estate unless their services were beneficial. Such cautionary admonition as to this special class of claimants cannot be deemed to have repealed by implication the restrictions which the courts had already established for other classes of claimants." 117 F.2d at 601.

Mere participation in a reorganization proceeding does not create a right to compensation. The spirit of the Bankruptcy Act requires economy of administration and forbids the duplication of compensation for the same services rendered by different parties. Milbank, Tweed & Hope v. McCue, 4 Cir., 111 F.2d 100, 101; In re Porto Rican American

Tobacco Co., supra. The fact that each of three separate claimants performed exactly the same service should not result in the estate paying for the same service three times, but rather the fee for the service should be divided among the three claimants. International Power Securities Corp., supra.

The elements which should be considered in making allowances to creditors committees and their attorneys are set out in International Power Securities Corp., and cases cited therein, 112 F. Supp. at 54.

In Detroit International Bridge Co., 6 Cir., 111 F.2d 235, 237, the elements to be considered in fixing fees were stated as follows: "Where the compensation of an attorney is to be fixed by the court, the attorney is entitled to the fair and reasonable value of the services rendered. Among the circumstances to be considered in fixing the compensation are,—the extent and nature of the services; the labor, time and trouble involved; the results achieved; the character and importance of the matter in hand; the value of the property or the amount of money involved; the learning, skill and experience exercised; whether the fee is absolute or contingent; and the ability to pay." And in Surface Transit, Inc. v. Saxe, Bacon & O'Shea, 2 Cir., 266 F.2d 862, 865, the court said: "Economy of administration, the burden the estate can safely bear, the value of the services to it, the duplication of service by many counsel representing the same interest, and the reasonableness and fairness of the compensation to each applicant are all steps along the way to a final determination. (citations omitted) And the recommendations of the Securities and Exchange Commission, representative of the public interest, are entitled to great weight. (citations omitted) Ultimately, however, the court's determination must be made on the facts and circumstances of each case."

The fees requested cover all services up to October 1, 1961. The SEC has been active in the case, and has made recommendations both to the master and to the court with respect to the requested allowances.

*The Several Applicants*

A. *George J. Lochner*, the disinterested trustee. Request, $20,000. SEC recommendation, $6,500. Master's recommendation, $6,500.

Lochner, for many years secretary of the Baltimore Association of Credit Men, had served as trustee in many ordinary bankruptcy cases, never in a Chapter X proceeding. He performed the routine duties of his position capably, but did not take an important part in the operation of the business, in the major decisions after the first month or so, or in the sale of the business, partly because of an illness early in 1960 which precipitated his retirement from active work. The recommended allowance seems about right, but Lochner's activities during the first month or so and the amounts involved justify an allowance of $7,500, which will be made.

B. *Fred T. Goodfellow*, operating trustee from July 29, 1959, to September 4, 1960. Request, $4,500 in addition to the $300 per week he was paid on account by order of court. SEC recommendation, the amount requested. Master's recommendation, no additional allowance.

The court agrees with the master that when former officials of a debtor operate the business under court supervision, they should expect to be called upon to devote additional time and effort to keep losses at a minimum and cannot ordinarily expect to receive a higher rate of pay than they received before the filing of the petition. In this instance, however, Goodfellow was required to do much more work than was contemplated when his tentative compensation of $300 a week was fixed. Most of the supervisors and buyers resigned and, although he was able to hire new buyers, he was required to do a great deal more supervisory work than had been expected. Both the SEC and the present counsel for the trustee recommend the additional $4,500, and it will be allowed.

C. *Irving B. Grandberg*, attorney for the trustees from August 3, 1959, until February 25, 1960. Request, $45,000. SEC recommendation, no allowance. Master's recommendation, $7,500.

Grandberg is an attorney with considerable experience in ordinary bankruptcy matters. He has had little or no experience in matters of this type or magnitude. He relied on the attorneys for the debtor to do much of the work he should have done. He should not have authorized Constantine, attorney for both the debtor and King Korn, to consult on his (Grandberg's) behalf with Arthur Young & Co., the accountants appointed by the court, and he should not have acquiesced in the suggestion made by Constantine or Mettee that the accountants eliminate from the draft of their report the statement with respect to the exchange of checks between Food Town and King Korn at the time of the issuance of $300,000 of the debentures, which indicated a possible preference. In view of Grandberg's awareness of the relationship between the two corporations, and of the possible issues involved in that and other transactions between them, it is not clear why he postponed the examination under sec. 21, sub. a of the Bankruptcy Act, 11 U.S.C.A, § 44, sub. a, of witnesses familiar with the King Korn transactions until after he had presented to the judge a plan for reorganization which called for the payment of King Korn's debentures in full. Moreover, he did not say anything to the judge about the exchange of checks. The SEC suggests collusion between Grandberg and the attorneys for Food Town and King Korn, and such failure in his fiduciary duties as would justify if not require a denial of any compensation to him on the ground that he was not "loyal" and "distinterested". As noted in the statement of facts, Grandberg resigned as counsel for the trustees on February 25, 1960.

After careful consideration of all the facts presented to the master and included in his report, and of the testimony, statements and arguments presented to me in open court and in written briefs, I am satisfied that there was no collusion between Grandberg and the attorneys for Food Town and/or King Korn, and no bad faith on his part, but woefully bad judgment and a failure to understand the problems presented by the case. His fatuity is accentuated by his contention that he is entitled to $250 or $300 per hour for some of his modest services and to $50 per hour for the rest, when he did not even take proper care of the ordinary housekeeping matters which any experienced bankruptcy practitioner should have been able to handle.[4]

The allowance recommended by the master is higher than I would have been disposed to fix, apart from his recommendation, but my confidence in the master's wide experience in bankruptcy matters and in his knowledge of this particular case persuade me to accept his recommendation and to allow Grandberg $7,500.

D. *Boothe, Dudley, Koontz and Boothe*, special counsel for the trustees in connection with the foreclosure of certain notes held by the debtors. Request, $400 fee and $135.11 expenses. Both the SEC and the master recommend allowance in full. The request seems proper and will be allowed.

E. *H. Vernon Eney*, attorney for the trustees after February 25, 1960. Request, $85,000 fee and $1,224.20 expenses. SEC recommendation, payment in

4. Since there was no bad faith, it is unnecessary to attempt to reconcile the conflicting views presented by such cases as Woods v. City National Bank and Trust Co. of Chicago, 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820; Young v. Higbee Co., 324 U.S. 204, 65 S.Ct. 594, 89 L.Ed. 890; Brown v. Gerdes, 321 U.S. 178, 64 S.Ct. 487, 88 L.Ed. 659; Crites, Inc. v. Prudential Insurance Co., 322 U.S. 408, 64 S.Ct. 1075, 88 L.Ed. 1356; Berner v. Equitable Office Building Corp., 2 Cir., 175 F.2d 218; Silbiger v. Prudence Bonds Corp., 2 Cir., 180 F.2d 917; Chicago and West Towns Ry. v. Friedman, 7 Cir., 230 F.2d 364; and Securities & Exchange Commission v. Cogan, 9 Cir., 201 F.2d 78.

full. Master's recommendation, $77,500 for the fee, and payment in full of the disbursements.

The master's recommendation has not been challenged by anyone. The proposed allowance is substantial, but the services rendered were admittedly of the highest quality and of great benefit to the estate, as appears from the master's report, which sets out the services in detail. The applicant, one of his partners and his associates spent 3,029 hours on the case. The recommendation of the master will be accepted by the court.

F. *Arthur Young & Co.*, certified public accountants, employed by the trustee pursuant to a court order, presented five separate bills, totaling $31,673.75, for accounting fees and expenses, viz.: (1) 22 Feb. 1960, $19,432.77; (2) 17 May 1960, $1,835.67; (3) 7 July 1960, $3,493.82; (4) 19 Dec. 1960, $6,128.34; (5) 1961, $783.15. They have heretofore received $10,000 on account of the first bill and $6,911.49 in full payment of the fourth and fifth bills. They seek allowance of the balance of $9,432.77 on the first bill and allowance of the second and third bills in full. The SEC recommends (a) disallowance of the entire first bill on the ground that the accountants breached the duty they owed the court; (b) failing that, disallowance of the balance of $9,432.77 for failure to comply with General Order 45;[5] (c) disallowance of the second and third bills for failure to comply with General Order 45. The master recommends an allowance of the $10,000 already paid, plus an additional $6,806.68 for the services and expenses covered by the first bill; and allowance of $1,785.50 for the services and expenses covered by the second bill, and $3,318 for the services and expenses covered by the third bill—a total of $11,910.18 in addition to the amounts heretofore paid. There is no dispute about the propriety of the payment of the fourth and fifth bills.

The Fourth Circuit has held that the provisions of General Order 45 are directory and not mandatory. Littleton v. Kincaid, 179 F.2d 848. Therefore, this court should exercise its discretion in light of all the circumstances, including the alleged breach of duty. Most of the facts bearing on this point are set out in the statement of basic facts, above.

The SEC contends that the accountants were guilty of a breach of duty to the court in deleting from the draft of December 30, 1959, the important material indicating a possible preference to King Korn, in failing to include that material in their report of January 7, 1960, and in stating in their report that nothing had come to their attention to indicate significant irregularities.

The accountants argue: (a) that they had fulfilled their responsibility by bringing the matter to the attention of the attorney for the trustee; (b) that up to the time they were instructed to discontinue audit work their attention had been directed primarily to examination of specific financial statements and had not yet been focused on a program of investigation into the debenture transactions, so that their knowledge of this matter was incomplete; (c) that the December 30 letter was nothing more than a confirmation of the existence and issuance by Food Town of a certain number of securities of various types and did not purport to deal with any problems involved in their issuance; and finally (d) that their report contained a disclaimer which relieved them from any responsibility of disclosure which they might otherwise have had.

When accountants are appointed by an order in such a proceeding as this, they become quasi-officers of the court and owe their primary duty to the court.[6]

5. "Order 45. Auctioneers, Accountants and Appraisers. No auctioneer or accountant shall be employed by a receiver, trustee or debtor in possession except upon an order of the court expressly fixing the amount of the compensation or the rate or measure thereof. The compensation of appraisers shall be provided for in like manner in the order appointing them."

6. In Brown v. Gerdes, 321 U.S. 178, 182, 64 S.Ct. 487, 489, 88 L.Ed. 659, the Court

In the ordinary case that duty is performed by reporting to and discussing problems with the trustee or his attorney. In this instance, however, the suggestion that the material be deleted had been made by an attorney representing the adverse interest (or by an attorney associated with him), and the foolish acquiescence in that suggestion by the attorney for the trustee did not relieve the accountants of their responsibility.

The American Institute of Certified Public Accountants has adopted Rules of Professional Conduct, of which Rule 5 provides in part as follows: "In expressing an opinion on representations in financial statements which he has examined, a member or associate may be held guilty of an act discreditable to the profession if (a) he fails to disclose a material fact known to him which is not disclosed in the financial statements but disclosure of which is necessary to make the financial statements not misleading; * * *."

A similar rule is included in Article 14 of the By-laws of the Maryland Association of Certified Public Accountants, Inc., of which the Washington representative of the accountants was a member. Sec. 1(a) of that Article is as follows: "Mis-statements and Omission of Facts: No member shall prepare or certify any statement containing a substantial misstatement of fact or omitting such a fact as would amount to a substantial misstatement or would result in a failure to put prospective investors, creditors, or others, on notice in respect of a material fact not specifically shown in such statement."

Near the end of his argument, counsel for the accountants said: "Of course, with the understanding which comes from hindsight, if Arthur Young had known that this was the last complete audit report which was to be submitted, if they had known that this report was going to be disseminated, as it was, and under the somewhat misleading context as it was, it would have made a great deal of difference. It was that kind of a letter."

The accountants should not have submitted a report which made no reference to the exchange of checks while stating that nothing had come to their attention to indicate significant irregularities. There is, however, some force in the argument that the accountants did not know at that time that they would not be allowed to complete their audit.

There was no collusion between the accountants and the attorney for King Korn.[7] There was no bad faith on the part of the accountants, and no such breach of duty as would justify the complete disallowance of all compensation for the audit and other work covered by their first bill.

The order of court passed on October 2, 1959, authorized the trustees to employ Arthur Young & Co. and to pay them at the rate of $25 an hour for principal, $15 an hour for manager, $10 an hour for senior staff accountant and $8 an hour for assistant staff accountant, the total fees not to exceed $10,000. They knew that the court had set a limit of $10,000 in its order, yet they did work involving charges of more than double that amount without further authorization from the court. No doubt they relied on Grandberg to obtain such an order, but they should have seen that the order was in fact obtained.

The master found that all of the services performed by the accountants have been charged for at the rates which were prescribed by the order of October 2, 1959; that those rates were somewhat less than the rates which the accountants

said: "In all cases persons who seek compensation for services or reimbursement for expenses are held to fiduciary standards." See also Dickinson Industrial Site, Inc. v. Cowan, 309 U.S. 382, 389, 60 S.Ct. 595, 599, 84 L.Ed. 819, where the Court said: "Fee claimants are either officers of the court or fiduciaries * * *."

7. Two weeks later they discussed the possible effect of the exchange of checks with the attorney for the SEC.

would ordinarily have charged a solvent client; and that unanticipated difficulties were encountered. He further found that the cost attributable to the final but incomplete report was approximately $1,700, and that the total charge of $4,300 for preparation of reports and accompanying statements based on incomplete auditing procedures, which resulted in the accountants declining an opinion as to the statements, exceeds the amount of compensation which would probably have been authorized in advance by the court. The master recommended an allowance of $2,150 for the work covered by the $4,300 charge. He also recommended the disallowance of certain expenses which he felt should have been covered by the hourly rates.

Although the breach of duty was far less serious than the SEC contends, it should be considered by the court, along with the failure to comply with General Order 45 in connection with the work covered by the first three bills, in fixing the allowance to the accountants. I conclude that the entire $4,300 for the preparation of the reports and statements referred to in the previous paragraph should be disallowed, along with the items of expenses disallowed by the master, but that all other bills of the accountants should be allowed in full. This will mean an allowance to the accountants of $9,760.18, in addition to the amounts they have already received.

G. *Bradley T. J. Mettee and Semmes, Bowen & Semmes*, attorneys for the debtors. Request, $42,500 fee and $1,090.64 expenses. SEC recommendation, $2,000 for services rendered up to and in connection with the filing of the petition, plus $580.57 expenses, no allowance for services thereafter. Master's recommendation, $3,500 fee for services in connection with the filing of the Chapter X petitions and in preparing the order appointing trustees, and $4,000 for services thereafter, plus $713.21 expenses.

There is no serious question about the propriety of the recommended allowance of $3,500 for services rendered up to and in connection with the filing of the petition. Thereafter, much of the work for which an allowance is requested was work which should have been done by the attorney for the trustees. The SEC recommended that no compensation be allowed to the attorneys for the debtors for services rendered after the filing of the Chapter X petitions, on the grounds: first, that the attorneys for the debtors were not disinterested persons under sec. 158 of the Bankruptcy Act (11 U.S.C.A. § 558) and could not qualify as attorneys for the trustee under sec. 157 (11 U.S.C.A. § 557) except for a specified purpose and only with the approval of the judge and therefore they should be denied compensation for services properly the function of the trustee or his counsel; and, second, that since the real client of the attorneys in practical effect was King Korn, the holder of $500,000 of Food Town's debentures with an interest in a plan of reorganization which would result in the continued use of King Korn trading stamps, the attorneys for the debtors in assisting the attorney for the trustee were representing conflicting interests.

The master felt that in addition to an allowance for their services in preparing the petitions, the attorneys for the debtors should also be allowed compensation for services rendered which were within the field of services normally performed by attorneys for debtors unless these services were affected by a conflict of interest. He found that no actual conflict of interest existed within the field of services for which compensation might be allowed, and that the attorneys for the debtors did not represent King Korn, but regarded their real clients as the stockholders of Food Town, Inc., particularly Service Food. He concluded: "The fact that Peter Volid was the beneficial owner of a controlling interest in the shares of common stock of Service Food Distributing Company and also the sole stockholder of King Korn Stamp Company, Inc., which had interests as both a secured and unsecured creditor senior to those of stockholders was not sufficient

to bar Semmes, Bowen & Semmes from acting as attorneys for the debtors. I find that Mr. Mettee and Semmes, Bowen & Semmes acted in good faith in rendering services as attorneys for the debtors and that they are entitled to reasonable compensation for their services in this field."

This conclusion was contested by the SEC at the hearing before the court. After additional evidence was offered and statements made, it became apparent that it would be very difficult to separate the time spent on matters in which King Korn had a direct or indirect interest and in which there might therefore be some conflict of interest from the matters in which there was no such possible conflict of interest.

However, Semmes, Bowen & Semmes has now filed a memorandum in which they state that although they still strongly disagree with the averments and position of the SEC, nevertheless, they withdraw any and all claims for compensation for time expended by them subsequent to the filing of the original petition and the amendment thereto.

The court will, therefore, allow them a fee of $3,500, plus expenses in the amount of $713.21.

H. *American National Bank and Trust Company of Chicago, Illinois,* indenture trustee. Request, $1,405 for services. SEC recommendation, $350. Master's recommendation, $250.

The indenture under which the claimant was trustee was the indenture under which the $500,000 of debentures, all held by King Korn, were issued. Claimant did not have to represent the interests of a group of bondholders, as is frequently the case, but acted, quite properly, on the instructions of the attorney for King Korn. That company filed a secured claim based upon the debentures which it held, and its attorney took an active part in the proceedings. The indenture trustee is not entitled to a fee out of the estate for the time spent in preparing and filing its claim. It is entitled to compensation for its routine services in consenting to nine sales free and clear of the lien of the indenture. For these services the $250 recommended by the master seems reasonable and will be allowed. If the trustee is entitled to any further fee or expenses for the period after September 30, 1961, it may apply later.

I. *Hilary W. Gans,* attorney for the indenture trustee. Request, $2,500 fee and $11.05 expenses. SEC recommendation, $200 plus expenses. Master's recommendation, $250 plus expenses. The court does not question the amount of time spent by Gans in attending various hearings and rendering other services to the indenture trustee, but under the law he is not entitled to an allowance out of the estate for the services he rendered his client in its capacity as a creditor. An allowance may be made only for those services which resulted in compensable benefit to the estate. Gans did not contribute toward the development of the plan, and his services were largely of a routine nature. He estimates that he spent ten hours in connection with the consents to sales free of the lien of the indenture, and for those services he may receive an allowance. For his other services he should look to his client for compensation. The master's recommendation of $250 plus expenses seems fair.

J. *General Unsecured Creditors Committee (Washington).* Request $24,500 fee and $621.86 expenses. SEC recommendation, $300 fee, plus expenses. Master's recommendation, $2,500 fee, plus expenses.

K. *Samuel M. Greenbaum,* attorney for the Washington committee. Request, $120,000 fee. SEC recommendation, $17,000. Master's recommendation, $22,-000.

It will be convenient to treat these two applications together. The members of the committee, which was organized on August 20, 1959, are the president of American Meat Co., the secretary of Kolker Poultry, Inc., and an officer of Washington Cheese Co., Inc., creditors having claims of $90,639, $72,111 and $11,692, respectively. The committee

was approved by the court and received formal designations to act from creditors whose claims aggregate over $700,000. Samuel M. Greenbaum acted as attorney for the committee.

The amount of compensation requested by the committee was not computed on the basis of time spent but was based on what the members of the committee believe to be reasonable compensation for their services.

The master found that the activities of this committee were beneficial in the administration of the estate in obtaining extensions of credit by suppliers, in considering the trustee's petitions for authority to sell assets, in evolving the formula for the settlement of the controversy between the trustees and the landlord of the Kent Village store, and also, in connection with the plan of reorganization, in submitting the Kroger offer, participating in conferences and hearings relating to the plan and obtaining acceptance thereof. He evidently felt that there had been little or no benefit to the estate from the other items referred to by the committee in their application, namely, suggestions to the operating trustee for improvement in management, investigation of the financial condition of the debtors, analysis of operating statements and furnishing information to creditors. Others also did these things.

Greenbaum, the attorney for the Washington creditors committee, is a member of the bar of the District of Columbia and of this court, and has for more than twenty years specialized in the practice of insolvency and bankruptcy law. As soon as he was appointed he made a thorough investigation and prepared a 19-page report and analysis, which the committee sent to all creditors. This report and its circulation was very helpful to all parties in interest. Greenbaum kept in close touch with the administration of the estate; he and the committee evaluated various reports and proposals and considered various routine matters, for which neither the committee nor the attorney is entitled to any large amount of compensation.

The principal items upon which Greenbaum bases his claim, and for which he is entitled to substantial compensation, in addition to his original investigation and report, are conferences with the several attorneys for Kroger, Greenbelt, Grand Union, and to a lesser extent American Stores, prospective purchasers of the stock or assets of Food Town, the formalization and submission of their offers to the attorney for the trustee, and the preparation of a proposed plan. Neither Greenbaum nor the committee sought out these prospective purchasers, but Greenbaum was well known to their attorneys, and they apparently wanted to deal with him. Greenbaum and his committee analyzed the offers, and Greenbaum drafted and submitted to the attorney for the trustee a proposed plan which contemplated that the trustee would seek authority to sell the Food Town property free and clear of liens to whichever of the prospective purchasers would submit the highest offer. This plan was not adopted by Grandberg, then the attorney for the trustee, who, with the approval of the Washington committee, drafted a plan based upon a proposed sale to Kroger. Competitive bidding was adopted by Eney when he became attorney for the trustee, but, of course, there was nothing novel about that idea, and the final plan was different from that proposed by Greenbaum. Greenbaum also assisted the committee and others in connection with the Kent Village store, thereby preserving the lease of one of the most valuable Food Town locations, in which all the prospective purchasers were interested.

On behalf of himself and of the committee, Greenbaum agrees that the master's findings of fact are correct, but he feels that they should receive larger allowances than have been recommended. The master had difficulty in separating the services performed by members of the Washington committee from those performed by its attorney; he concluded

that the principal credit for developing the offers of the Kroger Co. and the other prospective purchasers should be given to Greenbaum rather than to the committee, and recommended an allowance of $2,500 for the committee and $22,000 for Greenbaum.

Greenbaum's over-elaborate petition and meticulous time records show that he spent a total of 620 hours and 30 minutes on this matter, including a good deal of routine work. His requested fee of $120,000 is at the rate of about $200 an hour. The master's recommendation would allow him an average of about $35 an hour. This allowance seems high when the routine nature of part of his work is considered, but a substantial part of his work was important and very beneficial to the estate. It was all skillfully done. In fixing compensation for the Washington committee and Greenbaum, consideration must be given to the fact that an allowance must also be made to the secretary of the Baltimore creditors committee and to its counsel.

After considering all of the elements referred to in the Detroit International Bridge Company opinion, quoted above, and the admonitions contained in Judge Soper's opinion in Milbank, Tweed & Hope, and in other cases cited, I have concluded that I should follow the recommendation of the master with respect to the allowance to Greenbaum. The total allowance to the Washington committee and its attorney should be $25,000, and it should be divided $3,000 to the committee and $22,000 to its attorney. The expenses of the committee will also be allowed in the amount of $621.86.

L. *George Ashe,* Secretary, Unsecured Creditors Committee (Baltimore). Request, $1,250 fee and $227.74 expenses. SEC recommendation, no allowance. Master's recommendation, $200 fee and $144.24 expenses.

M. *I. William Schimmel and Marcy M. Ehudin,* attorneys for Unsecured Creditors Committee (Baltimore). Request, $45,000 fee and $1,922.41 expenses. SEC recommendation, $900 fee and $359.91 expenses. Master's recommendation, $3,500 fee and $359.91 expenses.

These two applications should also be considered together.

Ashe, a member of the bar of the courts of Pennsylvania, is the claims manager of the Credit Management Association of Delaware Valley. At the time of the filing of the petition herein, Ashe had received from members of an affiliated organization approximately 50 claims for attention and action. After a conference on August 7, 1959, between Ashe and the Baltimore law firm of Schimmel, Hettleman and Tatelbaum, who had previously represented members of the Association, a creditors committee was organized, consisting of representatives of Campbell Soup Co., McCormick & Co., Proctor & Gamble, creditors in the amount of $12,937.75, $3,555.88 and $11,646.60, respectively. Ashe served as secretary and I. William Schimmel and Marcy M. Ehudin as counsel for the committee, which was approved by the court and received authorization to act on behalf of approximately 193 creditors whose claims totaled $311,654.48.

Ashe wrote and received many letters to and from his clients and other creditors, had many telephone conversations with them and made ten trips to Baltimore for various hearings and conferences. He claims to have made important suggestions at one or more of the hearings. The master recommended that he be allowed the nominal sum of $200 for his services and $144.42 for expenses. Under the authorities allowing compensation for various types of services rendered by committees, and in view of the fact that no allowance is being requested by the committee members, this allowance appears too low.

Schimmel and Ehudin are experienced members of the Baltimore bar, who summarized their activities as follows: investigation of the financial condition of the debtors; meetings and discussions with the trustees and others relating to the operation and management of the business, including sales of unprofit-

able stores, rejection of leases, and the settlement of the controversy with the landlord of the Kent Village store; contacting and conferring with Grand Union Company, Food Fair, Inc., B. Green & Company, the Kroger Co. and Safeway Stores in an effort to obtain offers for the purchase of Food Town's assets; attendance at and participation in nine court hearings; working in unison with the attorney for the Washington committee in relation to the plan of reorganization and the acceptance thereof. Their petition is supported by a record showing 193¾ hours spent on the basis that only one attorney participated in the proceedings, although in many instances Schimmel, his partner Tatelbaum, and Ehudin all participated. In addition, they say that a reasonable estimate of their unrecorded time would be 267 hours.

The services rendered by the Baltimore attorneys were similar in many respects to the services rendered by the Washington committee and its attorney, but Greenbaum's services were more important and productive than those of the Baltimore attorneys in developing the interest of the prospective purchasers. Most of the work of the Baltimore attorneys was routine. They employed an accountant to obtain some information for possible purchasers of the assets, but no allowance can be made for his services because: (a) they were not authorized by the court, which had already authorized the trustees to employ a firm of accountants, and (b) it does not appear that the committee's accountant did much more than copy the reports which the trustees were filing in court every four weeks. After considering the evidence, the oral and written arguments of applicants, and the cases they cite, most of which are referred to above, I conclude that the secretary of the committee and its counsel should receive a total allowance of $5,000 plus the expenses recommended for allowance by the master, and that the $5,000 should be split $750 to Ashe and $4,250 to Schimmel and Ehudin.

N. *Harvey Dairy, Inc.*, a creditor, requested allowance to its counsel of a fee of $4,500. The SEC and the master recommended no allowance. It does not appear that the services of counsel for this creditor contributed to the plan which was confirmed or to the refusal of confirmation of any plan, or were beneficial in the administration of the estate. Under sec. 243, the application must be denied.

Counsel for the trustee will prepare an appropriate order.